IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

VALERIE GARDNER,

      Plaintiff,

v.

PRO-VIGIL, INC.

      Defendant.

CIVIL ACTION FILE

No. _____

## **COMPLAINT**

Plaintiff Valerie Gardner brings this action for unlawful employment practices against her former employer, Pro-Vigil, Inc., alleging as follows:

### *Parties, Jurisdiction, Venue, and*
### *Exhaustion of Administrative Remedies*

1.

Plaintiff Valerie Gardner is a woman who at all times relevant to this Complaint has been a resident and citizen of Sharpsburg, Coweta County, Georgia, which is located within this judicial district and division. She may be contacted through undersigned counsel.

2.

Defendant Pro-Vigil, Inc. is a Texas corporation that since 2015 has been owned (in part or in whole) by the Riverside Company, a private equity firm. At

all times relevant to this Complaint, Pro-Vigil was registered to do business and did in fact do business in the State of Georgia, including within this judicial district and division, where Plaintiff lived and worked for Pro-Vigil. It is subject to personal jurisdiction in this Court and may be served through its registered agent, CT Corporation System, at 289 S. Culver St., Lawrenceville, Gwinnett County, Georgia 30046.

3.

This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under federal law (i.e., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII")).

4.

Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, because this is the judicial district and division in which the events giving rise to Plaintiff's claims occurred and in which Defendant Pro-Vigil is deemed to reside.

5.

Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), which was assigned Charge No. 410-2020-05909.

6.

Ms. Gardner received her right to sue notice from the EEOC on January 7, 2022.

7.

Plaintiff and Defendant entered into a tolling agreement that tolled the 90-day window for Ms. Gardner to file suit between February 14, 2022, and June 1, 2022, a period of 107 days.

8.

On February 14, 2022, when the tolling period began, Ms. Gardner had 52 days remaining within which to file suit based on her receipt of the right to sue on January 7.

9.

Following a failed mediation and the expiration of the tolling agreement on June 1, 2022, Ms. Gardner still had 52 days remaining within which to file suit.

10.

This action is timely filed.

### *Facts Giving Rise to Plaintiff's Claims*

*Overview of Pro-Vigil's Business and Ms. Gardner's Employment There*

11.

Pro-Vigil sells security surveillance products and services, such as video surveillance solutions for businesses.

12.

Pro-Vigil sells what it describes as two classes of security solutions. "Fixed" surveillance solutions are intended for permanent and generally hard-wired installation on a customer's site—for example, the installation of security cameras at a car dealership or other business location. "Mobile" surveillance solutions are intended to serve as a more short-term or temporary solution, or when a customer's site does not have the electricity or wi-fi that would be needed to hard-wire surveillance equipment in—for example, the installation of security cameras at a construction site, or at a rural or agricultural site.

13.

Pro-Vigil employs "territory managers" to conduct sales within specified territories of its fixed or mobile solutions. Internally, including in some of the documents attached to this Complaint, Pro-Vigil sometimes refers to these territory managers as "TMs."

14.

Fixed and mobile territory managers reported to fixed and mobile "divisional sales managers," sometimes (including in some of the documents attached to this Complaint) referred to as "DSMs."

15.

The individual territories that territory managers were assigned to were grouped into "east" and "west" geographic divisions. There was a fixed and a mobile divisional sales manager in each of these each and west regions.

16.

Ms. Gardner was employed by Pro-Vigil, Inc. as a mobile territory manager from approximately April 1, 2016, until approximately July 1, 2020.

17.

Ms. Gardner's assigned territory was the State of Georgia, within Pro-Vigil's "east" geographic division.

18.

Ms. Gardner reported to Mike D'Amore, who at all times relevant to this Complaint was the divisional sales manager overseeing mobile territory managers in the east region.

19.

Ms. Gardner became a Pro-Vigil employee following Pro-Vigil's acquisition of her previous employer, E-Guard Monitoring & Security. Ms. Gardner had worked for E-Guard since approximately May 2012, and one term of Pro-Vigil's acquisition of E-Guard was that Ms. Gardner would become a Pro-Vigil employee.

20.

As a mobile territory manager for Pro-Vigil, Ms. Gardner did not work out of a brick-and-mortar Pro-Vigil office. She instead worked out of her home in Coweta County, on-site at customer locations, and out of her vehicle that she used to travel between her home and customer sites.

21.

Ms. Gardner satisfactorily performed her job duties at all times while employed by Pro-Vigil.

22.

Other than the performance improvement plan issued to Ms. Gardner in June 2020, which Ms. Gardner alleges was pretextual and intended to create a paper trail to document her subsequent termination on July 1, 2020, Ms. Gardner was never formally counseled or disciplined on her job performance at Pro-Vigil.

*During the COVID Pandemic, Pro-Vigil Announces a
50-50 Quota Split Between Fixed and Mobile Territory Managers*

23.

When the COVID pandemic began in March and April of 2020, it disrupted numerous businesses, including many of Pro-Vigil's clients. Some of Pro-Vigil's "fixed" customers began having excess inventory on hand that they were having to store off-site, in locations that were not well suited for the installation of fixed security solutions. Thus, these fixed customers began approaching Pro-Vigil about installing mobile solutions at these temporary sites.

24.

On April 2, 2020, Kirk Lynd (a Divisional Sales Manager over fixed territory managers) sent an e-mail to all mobile and fixed territory managers (among other recipients) with the subject "Driving Revenue During Pandemic."

25.

Mr. Lynd's e-mail stated: "We are seeing increased demand from our fixed customer base for temporary solutions to protect excess inventory during the pandemic."

26.

Mr. Lynd's e-mail went on to announce that Pro-Vigil was going to allow fixed territory managers to sell mobile solutions to accommodate their existing

fixed customers' needs. The company sold this as a win-win for fixed and mobile territory managers alike: "For the fixed TMs, this opens up a revenue stream during this tumultuous time. For the mobile TMs, it's an opportunity to gain additional quota credit outside their normal target industries."

27.

Mr. Lynd's April 2, 2020 e-mail went on to explain that quota credit for these mobile sales to fixed customers would be split "50/50" between the fixed and mobile territory managers: "Any Fixed TMs selling temporary mobile solutions to fixed customers will warrant a 50/50 quota credit split with the corresponding mobile TM."

28.

Mr. Lynd's April 2, 2020 e-mail specifically state that the quota split would apply to "*any*" sale of mobile solutions by a fixed territory manager to fixed customers. (Emphasis added.)

29.

According to Mr. Lynd's e-mail, this 50/50 quota split would apply regardless of whether the mobile territory manager was actually involved in the sale. By offering the split, the company ensured that *if* a mobile territory manager had to get involved with pre- or post-sales support, she or he would be

compensated. But it was expressly contemplated that "[i]n some cases, the mobile

TM may not need to get involved" at all, and in that case, the quota split would

still apply.

30.

Mr. Lynd's e-mail announced that the "process" for processing the quota

splits on these sales would work as follows: "Fixed TMs will be trained to create

mobile opptys, that will then be shared with the corresponding mobile DSM

(cc'ing the fixed DSM). The mobile DSM will then assign the mobile TM with the

split."

31.

Mr. Lynd concluded his April 2, 2020 e-mail by instructing the territory

managers to reach out to their divisional sales managers with any questions.

*Pro-Vigil Does Not Honor the 50-50 Quota Splits*
*for Female Mobile Territory Managers (Until They Object)*

32.

Mr. Lynd's April 2, 2020 e-mail advised that "[p]rospecting efforts have

already begun as of today," meaning that fixed territory managers were already

actively seeking out opportunities to make mobile sales to fixed customers.

33.

During the month of April 2020 alone, at least five of Pro-Vigil's fixed territory managers—Nathan Reinhart, Rick Rotatori, Durk Edwards, Jeff Kovach, and James Rossi (all males)—collectively made at least twenty-five sales of mobile solutions to Pro-Vigil customers.

34.

Quota credit for each of the aforementioned sales was supposed to have been split evenly between the fixed territory manager making the sale and the corresponding mobile territory manager assigned to the territory where the equipment was to be delivered and installed.

35.

For sales where the corresponding mobile territory manager was male, Pro-Vigil did in fact apply the quota split credit substantially in accordance with the April 2, 2020 e-mail from Mr. Lynd.

36.

Nevertheless, for sales where the corresponding mobile territory manager was female, Pro-Vigil did **not** initially split the quota credit with the female mobile territory manager (including Ms. Gardner). Instead, it initially allowed the male fixed territory managers to retain 100% of the credit.

37.

The table attached to this Complaint as Exhibit A, which was prepared by Plaintiff's Counsel, accurately summarizes the transactions detailed in the following paragraphs. In Exhibit A, in order to protect information that Pro-Vigil may consider confidential or proprietary, Plaintiff has assigned each opportunity a sequential number rather than provide details about Pro-Vigil's customers or job sites. (Exhibit A includes the transactions that Plaintiff became aware of during April 2020, but Plaintiff does not know whether every mobile sale by a fixed territory manager that took place in April 2020 is reflected here.)

38.

When Mr. Reinhart (a male, fixed territory manager) made four mobile sales to a customer in a territory where the assigned mobile territory manager was Rian Martin (also a male), quota credit for those four sales was split evenly between Mr. Reinhart and Mr. Martin. These transactions are reflected as Opportunities 1 through 4 in Exhibit A.

39.

When Mr. Rotatori (a male, fixed territory manager) made seven mobile sales to customers in a territory where the assigned mobile territory manager was Paul Curtis (also a male), quota credit for those seven sales was split evenly

between Mr. Rotatori and Mr. Curtis. These transactions are reflected as Opportunities 5 through 11 in Exhibit A.

40.

When Mr. Edwards (a male, fixed territory manager) closed seven mobile sales to customers in a territory where the assigned mobile territory manager was Carlos McCluskey (also a male), quota credit for those seven sales was split evenly between Mr. Edwards and Mr. McCluskey. These transactions are represented as Opportunities 12 through 18 in Exhibit A.

41.

When Mr. Kovach (a male, fixed territory manager) closed a mobile sale to a customer in a territory where the assigned mobile territory manager was Chris Bowman (also a male), quota credit for that sale was split evenly between Mr. Kovach and Mr. Bowman. This transaction is represented as Opportunity 19 in Exhibit A.

42.

When Mr. Rossi (a male, fixed territory manager) closed a mobile sale to a customer in Baltimore, where the assigned mobile territory manager was David Spector (also a male), quota credit for that sale was split evenly between Mr. Rossi and Mr. Spector. This transaction is represented as Opportunity 20 in Exhibit A.

43.

Yet, when Mr. Rossi closed at least five mobile sales within Ms. Gardner's assigned territory, Pro-Vigil did not initially honor the quota-credit split for Ms. Gardner. Instead, Mr. Rossi was allowed to keep 100% of the credit for himself. These transactions are represented as Opportunities 21 through 25 in Exhibit A.

44.

Kirk Lynd was the fixed divisional sales manager to whom Mr. Rossi reported. Mr. Rossi did not report to different divisional sales managers for the Baltimore sale and Georgia sales described in paragraphs 42 and 43, respectively.

45.

Pro-Vigil eventually gave Ms. Gardner credit for the quota split, but only after she engaged in the lengthy and at times adversarial communications detailed below in this Complaint, which placed a target on her back and eventually led to her termination.

46.

Pro-Vigil's refusal to allow Ms. Gardner to share in quota-credit splits for mobile sales within her territory by fixed territory managers was discriminatory based on Ms. Gardner's sex.

*Georgia's Female Mobile Territory Managers*
*Object to Pro-Vigil's Discriminatory Practices*

47.

In April 2019, Pro-Vigil had hired a second mobile territory manager in Georgia, another woman named Andrea Hawco. Ms. Hawco and Ms. Gardner were assigned distinct territories within Georgia, and they were the only mobile territory managers in Georgia from April 2019 until their terminations on July 1, 2020.

48.

By April 2020, both Ms. Gardner and Ms. Hawco were concerned that Pro-Vigil was denying female mobile territory managers the same opportunities it was providing to male mobile territory managers with respect to sharing in quota credits.

49.

Between April 13 and May 27, 2020, Ms. Gardner and Ms. Hawco raised concerns about Pro-Vigil's discriminatory practices on multiple occasions, both verbally (e.g., in a phone call on May 14 between the two women and Mr. D'Amore) and in e-mail correspondence (e.g., on April 13, May 20, May 22, and May 27), with at least Mr. D'Amore (their supervisor), Mr. Lynd, and even Pro-Vigil's Chief Revenue Officer Dave McCrossen.

50.

In these conversations, Ms. Gardner and Ms. Hawco made clear that they believed their male counterparts were being treated more favorably than they were with respect to quota credit splits for mobile sales by fixed territory managers.

51.

At one point, Mr. D'Amore told Ms. Gardner and Ms. Hawco that the decision whether to split quota credit on these sales was entirely up to the fixed divisional sales manager.

52.

That was inconsistent with the e-mail sent by Mr. Lynd on April 2, 2020.

53.

Further, even if it were up to the fixed divisional sales manager, that did not explain why James Rossi's divisional sales manager (Kirk Lynd) allowed a male mobile territory manager (David Spector) to share in quota credit for mobile sales by Mr. Rossi in Baltimore, but did not allow a female mobile territory manager (Plaintiff) to share in quota credit for mobile sales by Mr. Rossi in Georgia.

54.

Over the five to six weeks that these conversations took place, the situation grew increasingly adversarial as Mr. D'Amore and others grew tired of Ms. Gardner's and Ms. Hawco's protestations.

55.

On May 20, 2020, after Ms. Hawco and Ms. Gardner demanded that Mr. D'Amore explain why Atlanta, where the mobile territory managers were women, was excluded from the same opportunities that were given to "all the guys" in other markets, Mr. D'Amore restated without elaboration that it was up to the fixed divisional sales managers, and then he abruptly ended the conversation, stating: "This thread will end after this email. If you wish to have further discussion on this, check my calendar tomorrow."

56.

On May 22, 2020, Ms. Hawco and Ms. Gardner took their concerns to Pro-Vigil's Chief Revenue Officer, Dave McCrossen, and asked for his assistance in getting to the bottom of the disparate treatment afforded to them relative to their male peers.

57.

Mr. McCrossen acknowledged receipt of the May 22 e-mail on the day it was sent but advised that it would "require some time to respond."

58.

Five days later, on May 27, Ms. Gardner and Ms. Hawco followed up with Mr. McCrossen asking for a response.

59.

Pro-Vigil eventually relented and allowed Ms. Gardner to share in the quota credit for Mr. Rossi's multiple sales for the customer storing inventory at Atlanta Motor Speedway, but only after she complained multiple times and to multiple people about being denied that credit.

60.

Ms. Gardner was forced to jump through multiple hoops and overcome many hurdles to achieve the same benefit that her male counterparts were given as a matter of right.

61.

Throughout this time frame, everybody involved in these discussions understood that Ms. Gardner and Ms. Hawco were acting jointly and objecting to

the exclusion of the entire Georgia market (where they were the only mobile territory managers) from this policy of quota-credit splits.

62.

Throughout this time frame, everybody involved in these discussions understood that Ms. Gardner and Ms. Hawco believed they had been treated less favorably than other mobile territory managers because of their gender.

63.

The policies and practices that Ms. Gardner and Ms. Hawco were complaining about actually constituted discrimination in employment on the basis of sex, in violation of Title VII. Alternatively, at a minimum, Ms. Gardner and Ms. Hawco reasonably and in good faith believed that they were opposing unlawful discrimination when they complained, demanded explanations, and challenged the unconvincing and inconsistent explanations they were given.

*Pro-Vigil Lays the Foundation for Firing Ms. Gardner (and Ms. Hawco) by Issuing Them Performance Improvement Plans*

64.

After and because Ms. Gardner stood up against what she reasonably perceived to be sex-based discrimination, Pro-Vigil retaliated against her.

65.

Pro-Vigil decided that it wanted to fire Ms. Gardner in retaliation for her complaints, but it had no legitimate business reason to do so given her satisfactory job performance for the previous four years.

66.

In order to create a pretextual paper trail that would make it appear that it had a good-faith business reason for firing Ms. Gardner, Pro-Vigil placed Ms. Gardner on a performance improvement plan ("PIP") on approximately June 8, 2020.

67.

June 8, 2020, was less than three weeks after Ms. Gardner and Ms. Hawco and first escalated their concerns over Mr. D'Amore's head to Mr. McCrossen on May 22, and less than two weeks after they wrote to Mr. McCrossen on May 27 asking for a response.

68.

Ms. Gardner's June 2020 PIP was the first documented performance counseling she had ever received at Pro-Vigil.

69.

At the time Pro-Vigil issued the PIP to Ms. Gardner in June 2020, her termination was already contemplated and being discussed.

70.

Ms. Gardner's June 2020 PIP was not issued by Pro-Vigil as a good-faith attempt to correct any legitimate problems with Ms. Gardner's job performance. It instead was issued as a means of manufacturing a paper trail that would later support a pretextual explanation to justify Ms. Gardner's forthcoming termination.

71.

Ms. Gardner's June 2020 PIP was retaliatory in its own right, in addition to being intended to lay the foundation for a future retaliatory termination.

72.

Pro-Vigil placed Ms. Hawco on a PIP at the same time that it placed Ms. Gardner on a PIP.

73.

Prior to her June 2020 PIP, Ms. Hawco had also never been placed on a PIP or otherwise given documented performance counseling by Pro-Vigil.

74.

Ms. Hawco's PIP was similarly intended to facilitate the termination of a "squeaky wheel" who had been complaining about perceived discrimination.

75.

Ms. Hawco's and Ms. Gardner's PIPs were implemented by Mr. D'Amore, to whom both women had complained about perceived discrimination.

76.

Both Ms. Gardner's and Ms. Hawco's performance improvement plans were subjective, amorphous, and lacking in objective, measurable goals.

77.

The only substantive performance metric referenced in either woman's PIP was her monthly sales quota.

78.

In June 2020, both Ms. Gardner and Ms. Hawco met their monthly sales quotas.

*Ms. Gardner Engages in Further Protected Activity*
*and Is Fired Two Days Later*

79.

Aware that there was a target on their back, Ms. Gardner and Ms. Hawco treaded lightly during the month of June until June 29, 2020, at which point both women hit their June sales quotas.

80.

Before June 29, 2020, Ms. Gardner and Ms. Hawco had retained an attorney, David Groff, to represent them in connection with their concerns about discrimination and retaliation at Pro-Vigil.

81.

On June 29, 2020, having met their June sales quotas, Ms. Gardner and Ms. Hawco had Mr. Groff send a letter to Pro-Vigil about their discrimination and retaliation concerns.

82.

Mr. Groff's letter was sent on June 29, 2020 in hard copy and electronically via e-mail to Pro-Vigil's Chief Executive Officer, Lee Orr.

83.

Mr. Groff's letter stated that Ms. Gardner and Ms. Hawco had been "singled out" with respect to the commission splits, "with commissions being paid only to

male territory managers." He noted that both women "inquired as to why they were not given the same opportunities" as "male counterparts."

84.

Mr. Groff's June 29 letter advised that both Ms. Gardner and Ms. Hawco would be "filing charges of discrimination based on disparate treatment concerning pay and discrimination based on their sex," and that after receiving the right to sue, both women "intend to file a complaint due to Pro-Vigil's unlawful practices in violation of Title VII of the Civil Rights Act of 1964, as amended." He also asserted that both women were being subjected to "a hostile work environment."

85.

Mr. Groff's letter asserted that "Pro-Vigil is liable to both Ms. Hawco and Ms. Gardner . . . specifically to each as female employees of Pro-Vigil," which had failed to pay both women "in the same manner that their male counterparts . . . were compensated."

86.

Mr. Groff's letter made two separate references to Title VII, the federal statute that makes it unlawful to discriminate against employees on the basis of

sex (among other protected characteristics). It also requested "documentation concerning Pro-Vigil's Anti-Discrimination Policy and Grievance Procedures."

87.

Ms. Gardner was terminated on July 1, 2020.

88.

Ms. Gardner's termination was retaliatory for her complaints about discrimination and her stated intention to sue Pro-Vigil for discrimination.

89.

Ms. Hawco was terminated on July 1, 2020.

90.

July 1, 2020, was just two days after Mr. Groff's letter had been sent to and received by Pro-Vigil.

91.

July 1, 2020, was less than thirty days after Ms. Gardner and Ms. Hawco had been placed on PIPs relating to their monthly sales quotas.

92.

July 1, 2020, was after Ms. Gardner and Ms. Hawco met their monthly sales quotas in June 2020.

93.

At the time Ms. Gardner was fired, she was told she was being let go due to a "business decision."

94.

Pro-Vigil also provided Ms. Gardner with a Georgia Department of Labor ("GDOL") separation notice that identified the reason for her termination a "business decision."

95.

Only after Ms. Gardner's termination did Pro-Vigil state, in an attempt to have Ms. Gardner's application for unemployment benefits denied by the GDOL, that Ms. Gardner was fired for performance reasons.

96.

On the same date that Ms. Gardner and Ms. Hawco were fired, Pro-Vigil altered their PIPs to indicate that the women had "approved" those plans on the date of termination. In fact, neither woman ever "approved" her PIP.

97.

Other employees who had not engaged in protected conduct were treated more favorably than Ms. Gardner.

98.

For example, during Ms. Gardner's employment at Pro-Vigil, the company also employed a mobile territory manager named Daniel Jarosz.

99.

Mr. Jarosz is male and did not engage in any protected activity under Title VII during his employment with Pro-Vigil.

100.

Although Mr. Jarosz was placed on a PIP at the same time as Ms. Gardner and Ms. Hawco, and was also fired on July 1, 2020 for poor performance, Mr. Jarosz was nevertheless treated more favorably than Ms. Gardner.

101.

Mr. Jarosz's sales numbers for the six months preceding his termination were worse than Ms. Gardner's.

102.

Mr. Jarosz was given multiple, documented warnings about his job performance prior to his termination.

103.

The PIP that Mr. Jarosz was placed on in or around June 2020 was at least the second PIP he had been placed on in the preceding 12 months.

104.

Mr. Jarosz was given pre-termination warnings about his job performance and opportunities to correct the identified problems that Ms. Gardner was not given.

*Ms. Gardner Suffers Significant Pecuniary and*
*Non-Pecuniary Losses After Her Termination*

105.

Ms. Gardner was terminated approximately three and a half months into the COVID-19 pandemic.

106.

At the time Ms. Gardner was fired on July 1, 2020, many businesses were still in a state of uncertainty and fear about the future, and it was difficult for her to find comparable replacement employment.

107.

Following her termination, Ms. Gardner applied for dozens of jobs but never received an offer of comparable employment.

108.

Ms. Gardner eventually opened her own business in an attempt to mitigate her damages, but to date she has only earned enough revenue to cover her costs. She has not earned enough revenue or any profit from which to pay herself.

109.

Ms. Garner acted reasonably and in good faith in an attempt to mitigate her damages and earn a living to support herself and her family and maintain her lifestyle.

110.

Prior to her termination, Ms. Gardner had experienced certain traumas, including the sudden loss of a child and a subsequent diagnosis of post-traumatic stress disorder, which left her more susceptible to emotional harm than an average employee might be.

111.

Ms. Gardner's termination disrupted her sense of normalcy and stability and caused her to suffer emotional distress and mental anguish that was severe and lasting.

112.

Two years after her termination, Ms. Gardner's life has still not returned to her pre-termination "normal."

113.

Given the circumstances of Ms. Gardner's termination, the time that has passed since her termination, and the lengthy period of adversarial

communications between the parties, reinstatement is not a feasible or realistic remedy in this case.

114.

Plaintiff has been forced to retain counsel and incur attorneys' fees and expenses to vindicate her federally protected rights.

*Count I: Sex-Based Discrimination in Violation of Title VII*

115.

Plaintiff incorporates the preceding paragraphs as if fully restated herein.

116.

Pro-Vigil's refusal to allow Ms. Gardner to share in quota splits for mobile sales within her territory by fixed territory managers on the same terms that male mobile territory managers were allowed to share in such quota splits constituted discrimination based on Ms. Gardner's sex (female), in violation of Title VII.

117.

Pro-Vigil's stated reasons for refusing to apply its quota-split policy evenly to both women and men are false, pretextual, and intended to conceal the company's true, discriminatory motives.

118.

As soon as Pro-Vigil discriminated against Ms. Gardner by refusing to allow her to share in the quota splits, she suffered monetary and non-monetary harms (including emotional distress, humiliation, stress, and other mental anguish) for which Pro-Vigil is liable.

119.

The fact that Pro-Vigil relented on its discriminatory policy after Ms. Gardner (and Ms. Hawco) protested and took their complaints all the way to the company's Chief Revenue Officer does not alter the discriminatory nature of its initial actions.

120.

The fact that Pro-Vigil eventually paid Ms. Gardner for the quota splits (the monetary damages she suffered as a result of Pro-Vigil's discriminatory policy) does not take away from the non-monetary damages that she suffered as a result of the discrimination, for which Pro-Vigil is still liable.

121.

Plaintiff is also entitled to recover her attorneys' fees and expenses of litigation relating to her claim for discrimination.

122.

Pro-Vigil's discriminatory conduct was willful, wanton, in bad faith, and taken with intentional (or at a minimum, reckless) disregard for Ms. Gardner's rights under federal law, entitling Ms. Gardner to an award of punitive damages.

*Count II: Retaliation in Violation of Title VII*

123.

Plaintiff incorporates paragraphs 1 through 114 as if fully restated herein.

124.

Plaintiff engaged in protected activity under Title VII when, during at least the window of time between April 13 and June 29, 2020, she opposed what she reasonably and in good faith perceived as sex-based employment discrimination and threatened to bring Title VII claims against Pro-Vigil.

125.

Pro-Vigil intentionally and unlawfully retaliated against Plaintiff for engaging in protected activity by, among other things, placing her on an unwarranted PIP and then terminating her employment.

126.

Pro-Vigil's retaliatory intent is evidenced by, among other things, the temporal proximity between Plaintiff's complaints of discrimination and the

subsequent retaliatory actions, including placing her on a PIP less than three weeks after complaining to CRO Dave McCrossen about discrimination, and terminating her employment two days after her previous lawyer sent a letter to Pro-Vigil threatening suit under Title VII.

127.

Additional evidence needed to prove that Pro-Vigil acted with retaliatory intent is exclusively in the possession of Pro-Vigil until discovery can be completed. Upon information and belief, discovery will reveal internal documents and communications as well as comparator evidence that will show Pro-Vigil singled out Ms. Gardner for disparate treatment because of her protected activity.

128.

Pro-Vigil's retaliatory conduct described above has caused Plaintiff to suffer lost wages, lost benefits of employment, lost future earnings, diminished future earnings capacity, emotional distress, humiliation, stress, mental anguish, attorneys' fees, expenses of litigation, and other pecuniary and non-pecuniary losses for which Pro-Vigil is liable.

129.

Pro-Vigil's retaliatory conduct was willful, wanton, in bad faith, and taken with intentional (or at a minimum, reckless) disregard for Ms. Gardner's rights under federal law, entitling Ms. Gardner to an award of punitive damages.

### Demand for Jury Trial

130.

Pursuant to the Seventh Amendment of the United States Constitution, Rule 38(b) of the Federal Rules of Civil Procedure, and all other applicable laws, rules, and provisions, Plaintiff respectfully demands a trial by jury on all issues so triable.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully asks this Court to:

1.   Accept this case for filing and take all necessary actions to secure the just, speedy, and inexpensive determination of this case as provided for in Rule 1 of the Federal Rules of Civil Procedure;

2.   Grant Plaintiff full discovery into her claims and any defenses asserted by Defendant;

3.   Find in Plaintiff's favor on the merits of her claims;

4.   Award Plaintiff all legal and equitable relief to which she is entitled under the law and the facts of this case, including compensatory damages, punitive damages at the maximum rate allowed by law, back-pay, front-pay in lieu of reinstatement, pre- and post-judgment interest at the maximum rates allowed by law, attorneys' fees, and costs of litigation;

5.   Grant a trial by jury on all issues so triable; and

6.   Grant any further relief deemed necessary, proper, or just.

Respectfully submitted this 27th day of June, 2022.

_____
Jennifer K. Coalson
Georgia Bar No. 266989
jcoalson@pcwlawfirm.com
Andrew Y. Coffman
Georgia Bar No. 173115
acoffman@pcwlawfirm.com
Parks, Chesin & Walbert, P.C.
75 14th St. NE, Suite 2600
Atlanta, GA 30309
(404) 873 – 8000 (Phone)
(404) 873 – 8050 (Fax)

*Counsel for Plaintiff*

- 34 -

**Exhibit A**
To Plaintiff Valerie Gardner's Complaint
(*See* paragraphs 33 – 43)

Summary of April 2020 Mobile Sales by Fixed Territory Managers,
And Corresponding Quota-Credit Splits Initially Honored by Pro-Vigil

| Opportunity No. | Fixed TM (all males) | Gender of Corresponding Mobile TM | Quota Split Initially Honored? |
|---|---|---|---|
| 1 | N. Reinhart | Male | Yes |
| 2 | N. Reinhart | Male | Yes |
| 3 | N. Reinhart | Male | Yes |
| 4 | N. Reinhart | Male | Yes |
| 5 | R. Rotatori | Male | Yes |
| 6 | R. Rotatori | Male | Yes |
| 7 | R. Rotatori | Male | Yes |
| 8 | R. Rotatori | Male | Yes |
| 9 | R. Rotatori | Male | Yes |
| 10 | R. Rotatori | Male | Yes |
| 11 | R. Rotatori | Male | Yes |
| 12 | D. Edwards | Male | Yes |
| 13 | D. Edwards | Male | Yes |
| 14 | D. Edwards | Male | Yes |
| 15 | D. Edwards | Male | Yes |
| 16 | D. Edwards | Male | Yes |
| 17 | D. Edwards | Male | Yes |
| 18 | D. Edwards | Male | Yes |
| 19 | J. Kovach | Male | Yes |
| 20 | J. Rossi | Male | Yes |
| 21 | J. Rossi | Female (Plaintiff) | No |
| 22 | J. Rossi | Female (Plaintiff) | No |
| 23 | J. Rossi | Female (Plaintiff) | No |
| 24 | J. Rossi | Female (Plaintiff) | No |
| 25 | J. Rossi | Female (Plaintiff) | No |