## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| VALERIE GARDNER,<br><br>    Plaintiff,<br><br>v.<br><br>PRO-VIGIL, INC.,<br><br>    Defendants. | CIVIL ACTION FILE<br><br>No. 3:22-CV-00114-TCB-RGV |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Valerie Gardner submits this response in opposition to Defendant's Motion for Summary Judgment [Doc. 25], showing as follows:

## I.    Introduction

If this is in any respect a "textbook summary judgment case" (Defendant's Brief at 1), it belongs in textbooks to illustrate when summary judgment is not appropriate. After more than 4 years of successful employment without any performance problems or performance counseling, Plaintiff was placed on a performance improvement plan ("PIP") on June 9, 2020 and then fired on July 1, 2020. These actions followed a series of escalating and at times combative discussions between April 13 and late May 2020 about Plaintiff's concerns that Pro-

Vigil had discriminated against her by not giving her the same opportunity to share in quota credit for certain sales that her male counterparts were allowed to share in. Pro-Vigil eventually relented and paid Ms. Gardner the disputed commissions at the end of May. However, it immediately retaliated against her. Suddenly someone who had never had any performance problems, and whose performance during the first half of 2020 was on par with her 2019 performance despite an intervening pandemic, was placed on a PIP that advised her to improve her monthly performance. Then she was fired three weeks later, without even being given a full month to demonstrate improvement. A jury could rationally find that Plaintiff was discriminated and retaliated against, and summary judgment is improper.

## II.    Legal Standard

Even under the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), this case should proceed to trial. However, the *McDonnell Douglas* framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *accord Reymore v. Marian Univ.*, No. 1:16-cv-102-SEB-DMI, 2017 WL 4340352, at *8 (S.D. Ind. Sept. 29, 2017) ("[A] district court need not limit itself to analyzing the

evidence only according to the *McDonnel Douglas* template, nor should it be bound by the formulaic foxtrot which has developed under that framework."). "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328.

"A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal footnote and punctuation omitted). Such a mosaic may exist when, for example, the evidence consists of

> (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual.

*Lewis v. City of Union City*, 934 F.3d 1169, 1185. However, the convincing mosaic is not a standalone legal requirement or test with specific elements that must be satisfied. *Williams v. Housing Opportunities for Persons with Exceptionalities*, 777 F. App'x 451, 454 n.4 (11th Cir. 2019) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016)). The governing standard, of course, "is simply whether the evidence would permit a reasonable factfinder to conclude that plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other

adverse employment action." *Ortiz*, 834 F.3d at 765. In making this determination, the "[e]vidence must be considered as a whole," not in piecemeal fashion. *Id.* A Court must refrain from weighing conflicting evidence or making credibility determinations, and all evidence and inferences to be drawn therefrom must be viewed in the light most favorable to Plaintiff. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011).

## III.   Factual Background

### A.   The Relationship Between the Parties

Pro-Vigil sells security surveillance products and services that fall into two categories: "fixed" solutions intended for permanent or long-term use, and "mobile" solutions intended for short-term use. Defendant's Amended Statement of Material Facts [Doc. 32] ("DSMF") at ¶¶ 1-2. It employs "territory managers" (sometimes abbreviated "TM") to sell these products and services, and they are supervised by "divisional sales managers" (sometimes abbreviated "DSM"). Plaintiff's Statement of Additional Material Facts ("PSMF") at ¶¶ 1-2. Territory managers sell either fixed or mobile solutions, not both, at least until the pandemic caused Pro-Vigil to change its practices. PSMF at ¶ 3.

Plaintiff Valerie Gardner sold Pro-Vigil products and services for approximately nine years. From 2011 until April 2016, she was a salesperson for

E-Guard Monitoring and Security, which was Pro-Vigil's southeast distributor. PSMF at ¶ 4. Pro-Vigil acquired E-Guard in April 2016, and as part of that acquisition, Ms. Gardner became a mobile territory manager for Pro-Vigil responsible for parts of Georgia as well as other areas. PSMF at ¶ 5; DSMF at ¶ 17. For the next three-and-a-half years, she successfully performed her job duties, and there were no documented performance problems prior to January 2020. PSMF at ¶ 6. It is undisputed that she was never written up or disciplined for her job performance until June 2020, discussed below. *Id.*

However, Plaintiff would eventually be fired on July 1, 2020 (DSMF at ¶ 94), because, Pro-Vigil contends, her job performance took a dramatic turn for the worse during the first half of 2020. *See* DSMF at ¶ 100 (disputed) and response thereto. Yet she was on track to exceed her 2019 earnings, even though neither her base salary nor her commission structure changed, suggesting that her performance was at least comparable to, if not slightly better than, 2019. PSMF at ¶¶ 7-10; DSMF at ¶ 18. In fact, these alleged performance problems were not legitimate, but were pretext, manufactured in response to numerous claims of gender discrimination in May and June 2020.

**B.      Plaintiff's Legitimate Claims of Discrimination (May-June 2020)**

In April 2020, Pro-Vigil announced to its sales team certain changes to its compensation structure as a result of the COVID-19 pandemic. When COVID forced many businesses to close, some of those businesses needed to store excess inventory in temporary locations requiring mobile security solutions. PSMF at ¶ 11. One such business was Enterprise rental car company; with nobody renting cars at the beginning of the pandemic, Enterprise needed to store its excess inventory at offsite locations such as the Atlanta Motor Speedway, and it wanted to utilize Pro-Vigil's mobile solutions to protect its fleet against vandalism and theft, even though up until that time it had only acquired fixed solutions from Pro-Vigil. DSMF at ¶¶ 28-32. To accommodate these needs of customers like (but not limited to) Enterprise and provide it with a source of much-needed revenue amid the uncertainty of the pandemic, Pro-Vigil decided to deviate from what had previously been business as usual.

On April 2, 2020, Kirk Lynd, one of Pro-Vigil's fixed DSMs, announced to all of the company's sales team (fixed and mobile alike) some changes to Pro-Vigil's quota-credit policy. DSMF at ¶ 24; PSMF at ¶¶ 12-14; Plf0013 ([Doc. 33-3] at p.6). The company would now be allowing fixed TMs to sell mobile solutions to fixed customers. *Id*. Mr. Lynd announced that "***any***" such mobile sale by a fixed

TM "*will warrant* a 50/50 quota credit split with the corresponding mobile TM." *Id.* (emphasis added). There was no mention that a mobile TM would have to participate in the transaction to receive the credit split. PSMF at ¶¶ 12–13. In fact, Mr. Lynd's e-mail expressly contemplated that "[i]n some cases, the mobile TM may not need to get involved," and yet he still did not indicate that would in any way affect the mobile TMs' credit split on those transactions.[1] *Id.*

Because of that, Ms. Gardner and Andrea Hawco, the other mobile territory manager in the State of Georgia (also a woman), were understandably surprised when they learned less than two weeks later that they were not being allowed to share in quota credit for mobile sales by fixed TMs in Georgia. PSMF at ¶¶ 15–20; Plf0015 ([Doc. 33-3] at p.8); DSMF at ¶¶ 32, 35, 36, 38, 39. They were even more surprised when Plaintiff pulled a spreadsheet from Salesforce, Pro-Vigil's sales-management software, showing that they were the *only* mobile reps who were denied quota credit for sales by fixed reps, and that in *every other transaction* the male fixed reps and male mobile reps were allowed to share in that credit. PSMF at ¶¶ 18–20. Specifically, Ms. Gardner identified twenty-five sales of mobile

---

[1] It is of no significance that Plaintiff had never been previously been paid on deals with which she had no involvement, as Mr. Lynd's April 2, 2020 e-mail, which made no mention of that requirement, was expressly intended to announce a *change* in the way things had previously been done. PSMF at ¶ 14

solutions by fixed reps during April 2020. PSMF at ¶ 15. In 20 of those transactions, the representatives involved (both mobile and fixed) were all male. PSMF at ¶ 17. That included a sale by fixed TM James Rossi, a male, in Baltimore, Maryland, where the assigned mobile TM was David Spector, a male. PSMF at ¶ 17; Plf0014 ([Doc. 33-3] at p.7). Yet, for Mr. Rossi's five sales in Georgia, where the mobile TM was a woman, those were the *only* transactions in which the mobile TM was not allowed to share in quota credit. PSMF at ¶¶ 18-19. The significance of this jumped out at Ms. Gardner immediately:

> I mean, everyone that split the commissions, it was a male, male, male, male, except for Atlanta. The only – the only territory within all these accounts, within this account, the only territory was Atlanta which had a female salesperson

PSMF at ¶ 20. Thus, Ms. Gardner and her female counterpart decided to bring this to the attention of their employer.

Over the next month, between mid-April and the end of May 2020, Ms. Gardner and Ms. Hawco engaged in a series of escalating, and at times hostile, communications with Pro-Vigil about why they (and eventually Plaintiff alone) were excluded from these quota splits. PSMF at ¶¶ 22–28. Their initial inquiry was sent via e-mail dated April 13 to DSM Mike D'Amore, who was their direct supervisor, and to Mr. Lynd. PSMF at ¶ 22; Plf0015-16 ([Doc. 33-3] at pp.8-9). They had a phone call with Mr. D'Amore on May 14 in which they asked why they

"were not given the same opportunity to be included in on these deals, while the other *guys* were." PSMF at ¶ 23; Plf0017 ([Doc. 33-3] at p.10) (emphasis added). A week later, they pressed Mr. D'Amore for an answer in a string of e-mails that were exchanged on May 20. PSMF at ¶¶ 22–28; Plf0017-18 ([Doc. 33-3] at pp.10-11). Dissatisfied with Mr. D'Amore's curt explanation that it was entirely up to the managers over the fixed TMs whether to share credit or not (Plf0017),[2] Ms. Gardner and Ms. Hawco pushed him to explain "what was it exactly that excluded" them from these opportunities yet "INCLUDED these *guys* in 50/50 splits for ALL the other EHI contracts. . . . *All the guys*, by matter of fact, again with exception to Atlanta." PSMF at ¶ 24; Plf0018 ([Doc. 33-3] at p.11) (emphasis added). At that point, Mr. D'Amore cut the conversation off: "This thread will end after this e-mail." PSMF at ¶ 26; Plf0018 ([Doc. 33-3] at p.11). Plaintiff testified that throughout these discussions, their use of the gendered term "guys" was intentional. PSMF at ¶ 25.

Ms. Gardner and Ms. Hawco then took their concerns to Dave McCrossen, Pro-Vigil's Chief Revenue Officer. On May 22, 2020, Plaintiff sent an e-mail to Mr.

---

[2] Defendant's own corporate representative testified that "Mike did an ineffective job of articulating what – what the intent was." Osswald Dep. at 21:11-12; *id.* at 24:21-22 ("He could've been clearer."). This negates any suggestion that Plaintiff should have suggested his response at face value.

McCrossen to "formally request [his] research and responses" to the outstanding issues they had raised with Mr. D'Amore. PSMF at ¶ 27. She forwarded the thread of e-mails between herself, Ms. Hawco, and Mr. D'Amore to Mr. McCrossen, who acknowledged receipt that day and asked for "some time" to look into and respond to it. PSMF at ¶ 29; Plf0221-Plf0224 ([Doc. 33-3] at pp.13-16). It was eventually determined that all of the sales in question were in Ms. Gardner's territory, and not Ms. Hawco's. DSMF at ¶ 59. The company maintained that Mr. Lynd's April 2 e-mail was *supposed* to announce a policy change allowing a mobile TM to share quota credit only when he or she was actually involved in a sale. DSMF at ¶¶ 54–58. However, Pro-Vigil agreed that Mr. Lynd's email was unclear—implicitly conceding that Ms. Gardner's complaints were reasonable based on the information that had been communicated to her—and so it ultimately acquiesced and paid Ms. Gardner for those sales, admitting it had "clearly" made a mistake in not doing so sooner. DSMF at ¶¶ 58–59; PSMF at ¶¶ 30-31.

### C.   Pro-Vigil Retaliates Against Plaintiff for Her Complaints (June-July 2020)

Pro-Vigil maintains that because it eventually paid Ms. Gardner for the disputed transactions, that is the end of the story. Not so. Importantly, the evidence shows that while it might have begrudgingly paid Ms. Gardner to quiet

her complaints, it never fully gave her credit for the disputed sales, and it retaliated against her for making her prior complaints, setting in motion a chain of events that would culminate in the termination of Ms. Gardner as well as her co-complainant, Ms. Hawco.

On June 9, 2020, Plaintiff was placed on a performance improvement plan ("PIP"). This was the first PIP, and the first form of any documented performance counseling, that Plaintiff had ever been placed on in her 4+ years of employment with Pro-Vigil. PSMF at ¶ 6. Pro-Vigil's "Rules of Engagement" provide that a PIP may issue when a sales representative achieves less than 25% of quota attainment in a month. Plf011 at ¶ 17(a)(ii); DSMF at ¶ 8; Plf0011 at ¶ 17; Pro-Vigil000036 at Question #2 ([Doc. 33-3] at p.24); Plf0011 ([Doc. 33-3] at p.36).[3] However, the PIP was issued 9 days after a month in which Ms. Gardner was actually 182% to quota. PSMF at ¶¶ 33–34; Pro-Vigil000237 ([Doc. 33-3] at p.22). Nevertheless, the PIP lists Ms. Gardner's May 2020 sales as $1,489.00, or 23% to quota, in order to make the

---

[3] The Rules also say a PIP may issue if an employee has 2 consecutive months, or 3 months in any 6-month period, with less than 50% quota attainment. *Id.* It is undisputed Plaintiff never had 2 consecutive months with less than 50% quota attainment. Nor did she have 3 months in any 6-month period with less than 50% quota attainment, *except* if Pro-Vigil excludes the disputed transactions that it claims it gave Ms. Gardner credit for. The PIP itself indicates that she was being placed on a PIP for one month with less than 25% attainment.

discipline seem justified. PSMF at ¶ 36; Pro-Vigil000036 at Question #3 ([Doc. 33-3] at p.24). It is undisputed that the PIP issued *after* Pro-Vigil decided to pay Ms. Gardner for the disputed transactions, and therefore, it is inexplicable that it would nevertheless ignore those transactions for purposes of evaluating Ms. Gardner's job performance and deciding to place her on a PIP. DSMF at ¶ 76. Had Pro-Vigil properly applied its policy to Ms. Gardner, as it did to the male mobile TMs, she would not have been eligible for a PIP based on her performance in May, the month preceding the PIP.[4]

The evidence of retaliation does not end with the issuance of the PIP. Ms. Gardner's PIP was effective June 9, 2020. Pro-Vigil000036 ([Doc. 33-3] at p.24). Under "Plan for Improvement," Ms. Gardner was advised that she was expected

---

[4] Pro-Vigil might contend that the PIP was justified because she achieved less than 25% of her sales quota in other months, even if she exceeded her quota in May. This argument may be persuasive at trial, but at summary judgment, the Court is obliged to view the facts and inferences in the light most favorable to Plaintiff. Plaintiff had $0 in sales in January 2020, and it is undisputed that no action was taken against her in February, March, April, or May. PSMF at ¶ 32. Pro-Vigil contends that Plaintiff had $0 in sales in April 2020, and it is undisputed that no action was taken against her in May. From both the lack of discipline after two months with $0 in sales and the timing of the discipline that did eventually issue (the month after she significantly exceeded her quota, and also the month after her complaints of discrimination began), coupled with the intervening onset of COVID-19, a jury could reasonably infer that Ms. Gardner's PIP was not a legitimate performance-improvement mechanism but a pretextual and retaliatory action to punish her for her recent complaints of discrimination.

to increase her 60-day rolling close rate and meet or exceed her monthly quota. *Id.* But she was given no time to improve her numbers, because she was fired on July 1, just three weeks after being placed on the PIP. DSMF at ¶ 94. Ms. Hawco was issued a PIP at the same time as Ms. Gardner, and for the same reasons; she, too, was terminated on July 1. DSMF at ¶ 128; PSMF at ¶ 37.

The July 1 date of termination is significant for a number of reasons, but perhaps most importantly because it was ***the day after Plaintiff and Ms. Hawco formally notified Pro-Vigil that they intended to pursue claims of discrimination.*** While all of this was going on, the two women had retained a lawyer to represent them, and on June 30, 2020, that attorney wrote a letter to Pro-Vigil to formally advise the company that they intended to pursue claims of discrimination. DSMF at ¶ 95; Plf0123–124 ([Doc. 33-3] at pp.38-39). That letter was sent via e-mail and mail to Pro-Vigil's CEO, Lee Orr. *Id.* One day later, both women were fired. DSMF at ¶¶ 94 & 128.

A mobile TM named Daniel Jarosz, a man, was also placed on a PIP in June and then fired in July (DSMF at ¶ 129), but there are several reasons why that does not in any way suggest that Plaintiff's termination was merely one in a series of legitimate business-related terminations. First, it is undisputed that Mr. Jarosz's numbers leading up to the imposition of the PIPs were objectively and

- 13 -

significantly worse than Plaintiff's or Ms. Hawco's. PSMF at ¶ 38. Second, it is undisputed that although Plaintiff and Ms. Hawco had never been placed on a PIP before, Mr. Jarosz's June 2020 PIP was at least his second within the last twelve months. PSMF at ¶ 39. And third, it is undisputed that after being placed on his PIP in June, Mr. Jarosz closed that month with $0 in sales, below both Ms. Gardner and Ms. Hawco. PSMF at ¶ 40. In other words, despite previous recent documented performance counseling, Mr. Jarosz's job performance was, across the board, worse than Plaintiff's or Ms. Hawco's. On top of that, Ms. Gardner had three-plus years' tenure on both Mr. Jarosz and Ms. Hawco, during which time she had never been disciplined before. If Mr. Jarosz is relevant to the Court's analysis at all, it is to show that male Pro-Vigil employees, even lackluster ones, are given more warning and opportunity to improve their performance before termination than female employees. It in no way suggests that Ms. Gardner's termination was a legitimate, performance-based decision.

### III.   Argument and Citation of Authorities

#### A.   A Jury Could Find For Plaintiff On Her Discrimination Claim

##### 1.   Plaintiff Established a *Prima Facie* Case

Defendant does not dispute that Plaintiff is female or that she was qualified for her job, but it argues that she cannot establish a *prima facie* case of

discrimination because she cannot show that she suffered an adverse employment action or that she was treated less favorably than similarly situated employees outside of her protected class. Defendant's Brief at 3. It is undisputed that after Mr. Lynd seemingly announced that mobile TMs would be sharing in quota credit even for sales they were not involved with—even if Mr. Lynd's message did not accurately communicate Pro-Vigil's intention—Ms. Gardner discovered 25 sales of mobile solutions by fixed TMs. Plf0014 ([Doc. 33-3] at p.7). In 20 of those 25 instances, quota credit was, in fact, split between the two TMs. In just 5 of those instances, the fixed TM was allowed to keep 100% of the quota credit. Those 5 sales were also the only sales in which the relevant mobile TM was female. The amount at stake was half of $20,672.33. *Id.*

For weeks, Plaintiff, Ms. Hawco, and their supervisors and managers at Pro-Vigil, all the way up to the company's Chief Revenue Officer, went around and around on why the women TMs in Georgia had been treated less favorably than the male TMs everywhere else. The fact that Pro-Vigil eventually relented and paid Ms. Gardner the money at stake is of no consequence. A defendant cannot "moot" a discriminatory act by paying the employee the out-of-pocket losses attributable to the act. While Plaintiff does not seek to recover that $10,000 and change as damages for her discrimination claim, the payment of that amount "did not

eradicate the effects of the [employer's] alleged discriminatory conduct against [her]," *Albritton v. Kantor*, 944 F. Supp. 966, 974 (D.D.C. 1996), nor does it affect her entitlement to a finding of discrimination, declaratory and injunctive relief, an award of her attorneys' fees, and other relief based on that claim. *See, e.g., Morris v. Roche*, 182 F. Supp. 2d 1260 (M.D. Ga. 2002) (offer of reinstatement mooted plaintiff's claim for front pay – which is "essentially the same relief" as reinstatement – but did not moot the entire claim or eliminate the plaintiff's ability to recover other relief).

Critically, although Pro-Vigil seeks to be relieved of liability because it eventually relented to Ms. Gardner's demands and paid her the disputed commissions, it ignores the glaring and undisputed fact that it *still* refused to give her credit for those quota splits when analyzing her job performance and deciding to place her on a PIP the very next month, which then became the pretextual basis for her termination. With respect to her termination, likewise, Pro-Vigil's treatment of Daniel Jarosz, a male territory manager, is comparator evidence showing that males were given more leeway, more warnings, more opportunities to improve their performance, and otherwise treated more favorably than female mobile TMs such as Ms. Gardner and Ms. Hawco. Mr. Jarosz held the same position as Plaintiff, reported to the same supervisors as Plaintiff, was accused of

the same "misconduct" (poor performance) as Plaintiff, and had admittedly *worse* performance than Plaintiff both before and after the institution of the PIPs. Even so, he was given the benefit of *at least two* performance improvement plans before being terminated, while Plaintiff was not even permitted to complete her first.

It is interesting to note that Pro-Vigil has not come forward with *any* evidence whatsoever to suggest that the male territory managers who were allowed to share in quota credits were in any way differently situated than Ms. Gardner. If such evidence existed, it would be 100% within Pro-Vigil's custody and control. Yet rather than produce such evidence, Pro-Vigil invites the Court to speculate that perhaps something exists to suggest that there are other reasons these men were treated more favorably than Plaintiff.

Nevertheless, even in the absence of comparator evidence, summary judgment is not warranted when the record contains "other evidence of discrimination." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1277 (11th Cir. 2008). Such evidence exists here. When a company announces that a policy will be implemented in a particular manner, then implements the policy in that manner only with respect to male employees, then changes course and says it will give a female employee credit for sales consistent with the policy, but then turns around and fires that woman one month later for poor performance, based on sales

numbers that do *not* in fact include the disputed credits, that alone is evidence that would support a finding in favor of Plaintiff on her discrimination claim. Perhaps a jury will side with Pro-Vigil on this claim and find that this was little more than a misunderstanding. But there is evidence that would support the contrary conclusion, rendering summary judgment inappropriate.

## 2.   Pro-Vigil's Claimed Non-Discriminatory Reason Is Pretextual

Pro-Vigil contends that with respect to its refusal to allow Plaintiff to share in the commissions for Mr. Rossi's mobile sales in Georgia, "[i]t is beyond reasonable dispute" that it had a legitimate and non-discriminatory reason, which it articulates as follows:

> The original intent by Pro-Vigil's executive committee in allowing fixed solutions [sic] to sell mobile solutions was that if the mobile territory manager was involved with the sale that was brought to them by the fixed division, then the mobile territory manager was eligible for the 50-50 split, and if the fixed division managers decided to do it all themselves, then it would not be quota credit eligible.

Defendant's Brief at 7.

As noted above, there is nothing in the record that actually suggests any of the male mobile territory managers who shared in quota credit for sales by fixed TMs were actually involved with those sales. Nor is there any contemporaneous evidence other than Mr. Osswald's after-the-fact testimony to suggest that in fact the policy announced by Mr. Lynd was supposed to apply only if a mobile TM

was involved in a sale. The undisputed evidence shows that the *only* transactions for which a mobile TM was not allowed to share in quota credit were those in which the mobile TM was a woman. And after Plaintiff complained about it, Pro-Vigil eventually relented and agreed to pay her the commissions in question, although it would never fully give her credit and would subsequently retaliate against her for her complaints.

A reasonable jury would be more than justified to look at all of the evidence in this case and conclude that (1) Mr. Lynd's e-mail accurately reflected the intention to allow mobile TMs to share in quota credit even in those cases in which "the mobile TM may not need to get involved" (Plf0013); (2) when fixed TMs made mobile sales, quota credit was shared with male mobile TMs, but not with female mobile TMs, such as Plaintiff; and (3) Pro-Vigil's explanation of why Ms. Gardner was excluded from the policy is an after-the-fact, pretextual explanation designed to cover the true, discriminatory motive. Summary judgment should be denied as to the discrimination claim.

### B.    A Jury Could Find for Plaintiff On Her Retaliation Claim

Turning to Plaintiff's retaliation claim, the evidence is even stronger, and summary judgment plainly inappropriate. Plaintiff complained about "guys" being treated more favorably than her, and she testified unequivocally that she

was using that term in an intentional, gendered way. Gardner Dep. 140:18-20.

Although Pro-Vigil would suggest that no reasonable juror could conclude that

"guy" could be used in a gender-specific way, that is not so. *See*, *e.g.*, *United States*

*v. Barroso*, 108 F. Supp. 2d 338, 348 (2000) (noting that referencing a "person" is

"entirely neutral; in fact, it is more neutral than "he" or this "***guy***" because it does

not indicate gender") (emphasis added); *United States v. Akinkoye*, 185 F.3d 192, 198

(4th Cir. 1999) (holding that a statement referencing "'a guy in New York' . . . could

not possibly refer to Afolabi (who is a woman)"); *Marshall v. Precision Pipeline LLC*,

No. 13-cv-443-wme, 2015 WL 224689, at *18 (W.D. Wis. Jan. 15, 2015) (noting that

where the plaintiff had asked "for the same raise as 'the guys,'" the evidence

"might arguably allow a jury to infer that she had complained about sex

discrimination," even in the face of other evidence suggesting that that plaintiff

used "guys" to refer to her coworkers generally rather than to her male coworkers

specifically).

Even apart from Plaintiff's use of the gender-specific term "guys" to refer to

a spreadsheet showing that only women mobile TMs were excluded from sharing

in quota credits, there is the additional fact that on June 30, 2020, Ms. Gardner's

previous attorney sent a letter to Pro-Vigil expressly notifying the company of

Plaintiff's intention to file suit under Title VII. Even Pro-Vigil has to concede that

is protected activity. Defendant's Brief at 12. The fact that she had already been told she would be paid the disputed commissions does not render that letter any less protected activity. Pro-Vigil faults Plaintiff for not having any evidence that Orr actually received the letter, but Plaintiff did not move for summary judgment; Pro-Vigil did. It absolutely could have gotten an affidavit from its own CEO about what he did or did not receive, but it chose not to do so. A jury could conclude that the letter sent on June 30 via e-mail was received on the day it was sent.

This is a motion for summary judgment, and the Plaintiff is entitled to the benefits of all doubts. Pro-Vigil is entitled to argue to a jury that they should not find that Ms. Gardner's use of the term "guys" was a complaint of gender discrimination and that she otherwise did not engage in protected activity, but it is inappropriate at summary judgment to determine that a jury *must* side with Pro-Vigil on this question.

Nor is Pro-Vigil entitled to summary judgment on the basis of lack of an adverse action. Despite Pro-Vigil's cursory attempt to argue that a performance improvement plan can never amount to an adverse employment action, that is not the law in the Eleventh Circuit. All that is required is evidence showing that "a reasonable employee would have found the challenged action materially adverse, such that the action would have dissuaded a reasonable worker from making or

supporting a charge of discrimination." *Leatherwood v. Anna's Linens Co.*, 384 F. App'x 853, 858 (11th Cir. 2010) (internal punctuation omitted). The Court in *Leatherwood* found that "viewed cumulatively, the multiple counseling notices, negative evaluation, and 30-day probation Leatherwood received likely would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal punctuation omitted). Here, Plaintiff was placed on a PIP and then terminated before the employer even had the opportunity to give multiple other notices or evaluations. Other courts in this Circuit have found that PIPs can, in fact, constitute adverse actions. *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1279 (M.D. Ala. 2011); *Smith v. Quintiles Transnational Corp.*, 509 F. Supp. 2d 1193, 1203 (M.D. Fla. 2007); *Moore v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 544 F. Supp. 2d 1291, 1308–09 (M.D. Fla. 2008).

Plaintiff was also subjected to retaliatory termination, which is "the quintessential adverse employment action." *Sweeting v. Hill*, No. 1:19-cv-2200-JPB-LTW, 2021 WL 4236642, at *9 (N.D. Ga. May 20, 2021), *R&R adopted*, 2021 WL 3464382 (Aug. 6, 2021). The retaliatory PIP was the first step in that unlawful termination, which followed just three weeks later, before Plaintiff really had any opportunity to demonstrate improvement in her job performance.

For understandable reasons, Pro-Vigil attempts to paint Ms. Metzler as the sole decision-maker with respect to Plaintiff's termination, and then it attempts to paint a picture in which Ms. Metzler was wholly walled off from any knowledge about Ms. Gardner's prior complaints of discrimination. In reality, a jury could conclude otherwise. Ms. Metzler testified in no uncertain terms that while she was the one who "ultimately" made the decision to terminate Ms. Gardner, she asked questions of numerous other people who were involved in the process, including both Mike D'Amore and Dave McCrossen, to whom Plaintiff had directly complained. Metzler Dep. 44:8-23.

A jury could also find that it is simply not credible to believe that a brand new hire would come into a new role and make the unilateral decision to fire a long-time employee without speaking with the employee's prior supervisor (who placed her on a PIP) or the employee herself. The Supreme Court has long recognized that if a factfinder disbelieves an employer's articulated reasons for termination, that in and of itself is evidence that would support a finding of discrimination or retaliation. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1530 (11th Cir. 1997) (noting that when an employee shows that an employer's proffered explanations are not credible, that gives rise to a "permissible inference of discrimination" that renders summary judgment inappropriate); *St. Mary's Honor*

*Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with he elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination[.]").[5]

Defendant suggests that Pro-Vigil so uniformly applied its Rules of Engagement that a PIP *had* to issue any time a territory manager's numbers fell within one of the identified bases for a PIP. Defendant's Brief at 13. However, the undisputed evidence shows that even after months in which Ms. Gardner and other employees had $0 in sales, no PIP issued. The fact that a PIP issued *only* after Ms. Gardner's complaints, and after a month in which she was 182% to her quota, is evidence on which a jury could rely to find that the PIP, and the subsequent

---

[5] A jury is authorized to reject even uncontradicted testimony, although here there is ample evidence that does contradict Pro-Vigil's proffered reasons for the actions taken against Plaintiff. *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1190 (11th Cir. 2017) (Carnes, J., concurring); *Chapman v. AI Transp.*, 229 F.3d 1012, 1049 (11th Cir. 2000) (a plaintiff need not "cast doubt on each proffered reason in a vacuum," but rather, once she "cast[s] substantial doubt" as to some of those reasons, the factfinder is entitled to "rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available").

termination that relied upon it, were causally connected Ms. Gardner's complaints.

## IV.   Conclusion

This case turns on hotly disputed questions of intent, motive, knowledge, and credibility, which are not appropriately resolved at summary judgment.[6] Plaintiff has shown that there are disputed and material issues of fact that would support a verdict in her favor, as many of the key facts on which Defendant relies are in fact hotly disputed, particularly relating to the timing of her PIP and termination relative to her protected activity. For all of these reasons, Plaintiff respectfully asks that this Court deny Defendant's motion and set this case for trial.

Respectfully submitted this 31st day of May 2023.

/s Jennifer K. Coalson
Jennifer K. Coalson
Georgia Bar No. 266989
Parks, Chesin & Walbert, PC
75 14th St. NE, 26th Floor
Atlanta, GA 30309
(404) 873 - 8000

---

[6] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); *see also Poller v. CBS*, 368 U.S. 464, 473 (1962) (noting that "[t]rial by affidavit is no substitute for trial by jury," particularly in cases "where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot").

jcoalson@pcwlawfirm.com

*Counsel for Plaintiff*