## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA NEWNAN DIVISION

| | | |
|---|---|---|
| VALERIE GARDNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. |
| | ) | 3:22-cv-00114-TCB-RGV |
| PRO-VIGIL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT PRO-VIGIL, INC.'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Valerie Gardner's response in opposition to Defendant Pro-Vigil, Inc.'s ("Pro-Vigil") Motion for Summary Judgment further highlights the reasons summary judgment should be granted in Pro-Vigil's favor in this matter. Plaintiff's opposition is heavy on unsupported beliefs and conjecture, but lacks any substantive evidence to support her claims.

## I.     PLAINTIFF'S TITLE VII GENDER DISCRIMINATION CLAIM FAILS AS A MATTER OF LAW.

### A.     Commission Claim

Plaintiff bases her commission claim on a spreadsheet that she generated from Salesforce that she contends shows that quota credit on certain deals, primarily EHI, were split between Fixed Territory Managers and Mobile Territory Managers. Her theory is that because the Mobile Territory Managers that were included in the EHI

deals are male, and she was not included in the EHI deal and is female, there must be some unlawful motive. However, she presents no substantive evidence to support her claim.

Plaintiff contends that male Mobile Territory Managers Rian Martin, Paul Curtis, Carlos McCluskey, Chris Bowman and David Spector were allowed to participate in the EHI sales and split commissions while she initially was not. (See Defendant's SOMF ¶ 106 (admitted).) However, Plaintiff admits that she does not know Martin, Curtis, McCluskey, Bowman or Spector's involvement in the EHI mobile program sales. (See Id. ¶ 107 (admitted).) In fact, other than the spreadsheet, she presents no evidence concerning the involvement of any of the individuals on the various deals, or that quota credit or commissions were actually split on those deals.

Plaintiff incorrectly attempts to shift the burden of proof onto Pro-Vigil and argues that "Pro-Vigil has not come forward with any evidence whatsoever to suggest that the male territory managers who were allowed to share in the quota credits were in any way differently situated than [Plaintiff]." (Opposition, p. 17.) However, Plaintiff has the burden of proving as part of her *prima facie* case that she was similarly-situated to the alleged comparator employees in every relevant aspect. Pierri v. Cingular Wireless, LLC, 397 F.Supp.2d 1364, 1372 (N.D.Ga. 2005). She

has failed to meet her burden.

After she complained to Dave McCrossen that Pro-Vigil was changing the rules of engagement and not following the criteria set out in Lynd's April 2, 2020 email (see SOMF ¶¶ 48, 51 (admitted)), Plaintiff was paid commissions on the EHI deals (Id. at ¶¶ 59, 62 (admitted)). Plaintiff's argument that Pro-Vigil's payment of the commission does not "'moot' a discriminatory act" (Opposition, p. 15) misses the point. There is no evidence that Plaintiff was subjected to gender discrimination on the EHI deals or that she was treated less favorably than male territory managers.

Moreover, Plaintiff's argument that Pro-Vigil "refused to give her credit for those quota splits when analyzing her job performance and deciding to place her on a PIP the very next month" (Opposition, p. 16) is a red-herring. Plaintiff's job performance was evaluated based on the *actual* performance of her job, not what credit she may have gotten from deals in which she played no part. Even if the credit for the EHI deals given in May 2020 were taken into account, it still does not negate the fact that Plaintiff admittedly had $0 in sales in January and April 2020. (SOMF ¶¶ 66, 69 (admitted).)

Finally, Plaintiff presents no evidence from which a reasonable jury could infer that its reasons for not initially paying Plaintiff for the EHI deals were false AND that gender discrimination was the real reason. Plaintiff presents absolutely no

evidence whatsoever from which a jury could infer that Osswald's testimony concerning the original intent behind the change in quota split policy was false or incorrect. Plaintiff's assertion of "after-the-fact testimony" concerning why she was initially excluded from the EHI deals does not make it any less true. (See Opposition pp. 18-19.) Other than pointing to the fact that the Mobile Territory Managers allegedly allowed to participate in the EHI deals are male, Plaintiff offers no other evidence of discrimination.

### B.   Termination Claim

Plaintiff also contends that her termination was based on gender discrimination because Daniel Jarosz, a male territory manager, was "given more leeway, more warnings, more opportunities to improve [his] performance, and otherwise treated more favorably than" her. (Opposition, p. 16.) However, Plaintiff is attempting to argue out of both sides of her mouth. On the one hand, she argues that Jarosz's job performance was substantially worse than hers (Id. at p. 14), and then on the other, attempts to argue that Jarosz is a similarly situated comparator (Id. at pp. 16-17).

Plaintiff's entire argument concerning Jarosz being treated differently is based on the fact that his PIP indicates that he was placed on a PIP in the prior 12 months. (Opposition, p. 14.) However, Plaintiff presents no evidence concerning the nature

of any prior PIP issued to Jarosz, whether it was due to lack of quota attainment or some other issue, or who issued it to him. Again, Plaintiff attempts to present conjecture as evidence.

The undisputed evidence in the record shows that Plaintiff was treated the same as Jarosz. D'Amore issued Plaintiff a PIP on June 9, 2020. (SOMF ¶ 71 (admitted).) Plaintiff's PIP was based on "1 month with <25% quota attainment." (Id.) Plaintiff testified that prior to December 2019, she had never had a month with sales less than 25% of the $6,500 quota, or $0 in sales. (Gardner Dep. 63:14-64:7, 141:6-9.) Plaintiff had $0 in sales in January and April 2020. (SOMF at ¶¶ 66, 69 (admitted.) She also had only $1,489 in sales (less than 25% goal attainment) in May 2020, absent the EHI deals in which she played no part. (Id. at ¶ 70.) Thus, there is substantial and uncontroverted evidence that Plaintiff's job performance took a dramatic turn for the worse in the first half of 2020.[1] Upon receiving the PIP, Plaintiff understood that one of the plans for improvement was to meet or exceed the $6,500

---

[1] Plaintiff's argument that "she was on track to exceed her 2019 earnings, even though neither her base salary nor her commission structure changed" (Opposition, p. 5) is pure speculation. Plaintiff's contention that "her performance [in 2020] was at least comparable to, if not slightly better than 2019" (Id.) is contradicted by her own testimony that, prior to December 2019, she had never had a month with sales less than 25% of the $6,500 quota, or $0 in sales, and yet she had $0 in sales in January 2020, $0 in sales in April 2020, and only $1,489 in actual sales in May 2020 (less than 25% of her goal).

monthly quota going forward. (Id. at ¶ 79 (admitted).)

The undisputed evidence also shows that D'Amore issued Jarosz a PIP on June 8, 2020. (Id. at ¶ 129 (admitted).) Jarosz's PIP was based on having "3 months in any 6 month period <50% quota attainment average." (Id.) In the period from December 2019 to May 2020, Jarosz had no months with $0 in sales, but his average sales were less than 50% quota attainment for at least three out of six months. (Id.) Jarosz's PIP also required he "consistently attain[] month quota target" of $6,500. (Id. at ¶ 130 (admitted).)

Jennifer Metzler was made aware during her onboarding by D'Amore of PIPs pending on three employees: Plaintiff, Hawco and Jarosz. (Id. at ¶ 83 (admitted).) Metzler did her own due diligence to make sure that the PIPs were "on the up and up, communicated appropriately, the numbers reflected reality before [she] was willing to take on the next step" and "to learn for myself what the situation was." (Id. at ¶ 88 (admitted).) As part of her due diligence on the PIPs, Metzler went back through Salesforce, which is Pro-Vigil's record of sales, and looked at whether or not the activities with customers or potential customers were recorded in Salesforce, checked on how many opportunities were created in the given month, checked whether that was aligned with the KPIs that were in place, and whether it appeared that there was an effort to improve individual performance. (Id. ¶ 89 (admitted).) At

the end of June, neither Plaintiff nor Jarosz met the monthly $6,500 quota, and Metzler terminated their employment. (Id. at ¶¶ 91, 92, 131 (admitted), 132 (admitted).)[2] Metzler made the decision to terminate Plaintiff's employment at the end of June based on Plaintiff's inconsistency in sales, especially in light of the fact that other mobile territory managers (other than Plaintiff, Hawco and Jarosz) were hitting their monthly quotas every month. (Id. at ¶¶ 92, 93 (admitted).)

Plaintiff's contention that her PIP was discriminatory because no action was taken immediately following the months in which she had $0 in sales is yet another red-herring that is not supported by the evidence. Jarosz's PIP shows that he had less than 50% goal attainment in December 2019, January 2020, February 2020, and that he hit the 50% goal attainment in March 2020. (Id. at ¶ 129 (admitted).) However, no PIP was issued until June 2020. (Id.)

It is beyond reasonable dispute that Pro-Vigil had a legitimate, non-

---

[2] Plaintiff's argument that the spreadsheets showing Plaintiff's actual sales was produced after depositions and after the close of discovery and creates too many genuine questions about its contents to create a material fact question is disingenuous. The 30(b)(6) depositions were not taken until a few days before the expiration of the discovery period. Once it was discovered that the reports had not previously been produced, Pro-Vigil provided some of that information during its corporate representative's deposition, and produced the documents within a few days. Regardless, Plaintiff has not made a motion under Rule 56(d) that she is unable to present facts essential to justify her opposition. In fact, Plaintiff testified that she has no information to dispute the sales numbers in her PIP. (Gardner Dep 66:17-67:4, 67:19-25, 68:4-5, 68:12-17, 69:9-14, 100:25-101:3.)

discriminatory reason to terminate Plaintiff's employment: Plaintiff's job performance took a downturn, and she failed to meet the required quota attainment, failed to improve her performance in June 2020, and did not meet the $6,500 goal as required in her PIP. Even if Plaintiff disagrees with Pro-Vigil's actions or suggests that they were unfair, misguided, or just plain wrong, this is irrelevant for purposes of the analysis.

There is no evidence from which a jury could reasonably infer that Plaintiff's PIP was not a legitimate performance-improvement mechanism. Moreover, there is no evidence that Pro-Vigil's reasons for Plaintiff's termination were false AND that discrimination was the real reason.

## II.    PLAINTIFF'S TITLE VII RETALIATION CLAIM FAILS AS A MATTER OF LAW.

Plaintiff's arguments on her retaliation claim completely ignore the evidence in this case and are based on mere speculation in an attempt to overcome summary judgment.

First, Plaintiff contends that she engaged in protected activity and complained about gender discrimination through the use of the term "guys" in an "intentional, gendered way." (Opposition, pp. 19-20.) However, Plaintiff admitted in her deposition testimony that during conversations with D'Amore, when she referenced "guys," she never indicated to D'Amore that she believed that her gender was the

8

reason she was not able to participate in those deals. (Gardner Dep. 82:22-83:2) Plaintiff also admitted that she never told D'Amore that she believed they were discriminating against her because of her gender. (Gardner Dep. 94:2-19.) Plaintiff further admitted that she never told McCrossen that she believed she was being discrimination against because of her gender. (Gardner Dep. 81:15-18, 94:20-95:1, 96:10-20, 97:16-18.) Plaintiff cannot now create an issue of fact by contradicting her deposition testimony to assert that she *intended* to report gender discrimination by using the term "guys" in her communications when she admits she made no such complaints of gender discrimination.

Second, even assuming that the use of "guys" in a complaint is protected activity, it is undisputed that Metzler, the decision-maker, did not know about Plaintiff's prior complaints to D'Amore or McCrossen at the time of her decision to terminate Plaintiff's employment. (SOMF ¶ 84 (admitted).) Without pointing to any evidence whatsoever, Plaintiff asserts that a jury could conclude that Metzler was not "walled off from any knowledge about [Plaintiff's] prior complaints of discrimination" because Metzler "asked questions of numerous other people who were involved in the process," including D'Amore and McCrossen, and that "it is simply not credible to believe that a brand new hire would come into a role and make the unilateral decision to fire a long-time employee without speaking with the

employee's prior supervisor …." (Opposition, p. 23.) However, Plaintiff's counsel specifically questioned Metzler about her communication with D'Amore about Plaintiff and Hawco:

> Q:  Okay. What did he [D'Amore] tell you about Ms. Hawco?
> A:  She could be combative on the phone. Things I really didn't want to know because I wanted to find out for myself, but yeah.
> Q:  Did he tell you that Ms. Hawco had been complaining to him about her pay?
> A:  No, not specifically.
> Q:  Did he tell you that Ms. Gardner had been questioning the pay practices of Pro-Vigil?
> A:  He did not.

(Metzler Dep. 50:3-12.) Metzler also testified that she undertook her own due diligence concerning Plaintiff's PIP[3] (as well as Hawco's and Jarosz's), and looked at Plaintiff's activities in Salesforce to determine how many opportunities she was creating and whether there was an effort to improve her performance. (SOMF ¶¶ 88-89 (admitted).) When Metzler did not see any performance improvement or the required effort from Plaintiff, and Plaintiff failed to meet her sales quota in June

---

[3] Plaintiff contends that her PIP could be considered an adverse action if "a reasonable employee would have found the challenged action materially adverse, such that the action would have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Opposition, pp. 21-22.) However, there is no evidence in this case from which a reasonably jury could find a reasonable employee would be dissuaded from making a claim. It is undisputed that at the time the PIP was issued, Pro-Vigil had already agreed to pay Plaintiff commission on the EHI deals about which she complained. (SOMF ¶ 76.)

2020, Metzler made the decision to terminate Plaintiff's employment based on Plaintiff's inconsistency in sales. (Id. at ¶¶ 90, 92 (admitted).)

Third, while Plaintiff's counsel's June 30 letter would constitute protected activity, there is no evidence that anyone at Pro-Vigil other than possibly Lee Orr knew about the letter before Plaintiff's termination. Plaintiff presents no evidence that Orr shared it with anyone else at Pro-Vigil prior to the week of July 6, 2020, after Plaintiff's termination. (Id. at ¶¶ 97, 98 (admitted).) Regardless, the undisputed evidence is that Metzler, the decision-maker, did not know about the June 30 letter until at the time of her decision to terminate Plaintiff's employment. (Id. at ¶ 123 (admitted).) Metzler testified as follows concerning the June 30 letter:

> Q:     … I think you said earlier that you were never made aware that Ms. Gardner had been complaining about Pro-Vigil's pay practices?
> A:     No.
> Q:     Okay. Were you ever made aware of that after the fact?
> A:     After the fact.
> Q:     After her termination?
> A:     Well after the fact. Like – like –
> Q:     Prior to her filing – I'm sorry. Go ahead.
> A:     Last week.
> Q:     Last week?
> A:     Yeah. This – I was not aware of any of that until I read the documents.
> Q:     Okay. Were you ever made aware – well I think you just answered this but just to be clear – were you ever made aware of a letter from Ms. Gardner's legal counsel to Pro-Vigil after her termination?
> A:     Yes.
> Q:     Tell me what you remember about that.

> A:      I learned about it yesterday.

(Metzler Dep. 66:11-67:8.) Plaintiff presents no evidence to the contrary.  As such, Plaintiff has failed to establish that the decision-maker was aware of any protected expression at the time she took adverse action, or that a causal link exists between her complaints and her termination.  See James v. City of Montgomery, 823 Fed. Appx. 728 (11th Cir. 2020) (holding that "to establish causation, a plaintiff needs to show that the decisionmaker actually knew about her protected expression") (citing Martin v. Fin. Asset Mgmt. Sys., Inc., 959 F.3d 1048 (11th Cir. 2020)). Moreover, Plaintiff has not presented a convincing mosaic of circumstantial evidence that creates a triable issue about Pro-Vigil's retaliatory intent.

## CONCLUSION

For the foregoing reasons, the Court should grant Pro-Vigil's Motion for Summary Judgment on all claims.

Respectfully submitted this 14th day of June, 2023

**GORDON REES SCULLY MANSUKHANI, LLP**

*/s/ N. DeWayne Pope*
Leslie K. Eason
Georgia Bar No. 100186
N. DeWayne Pope
Georgia Bar No. 141891
55 Ivan Allen Jr. Blvd., NW
Suite 750

Atlanta, Georgia 30308
(404) 869-9054
leason@grsm.com
dpope@grsm.com

*Counsel for Defendant Pro-Vigil, Inc.*

## **CERTIFICATION**

In accordance with Local Rules 5.1(C) and 7.1(D), I hereby certify that this document has been prepared in 14 point, Times New Roman font.

Dated:    June 14, 2023

*/s/ N. DeWayne Pope*
N. DeWayne Pope
*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this 14th day of June 2023, electronically filed the foregoing **DEFENDANT PRO-VIGIL, INC.'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** using the Court's CM/ECF e-filing system, which will automatically and electronically serve the parties of record in this matter.

*/s/ N. DeWayne Pope*
N. DeWayne Pope
*Counsel for Defendant*

13

Valerie Gardner                                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 1

1                  IN THE UNITED STATES DISTRICT COURT

2                FOR THE NORTHERN DISTRICT OF GEORGIA

3                          NEWNAN DIVISION

4

5        VALERIE GARDNER,

6             Plaintiff,

7        vs                          CIVIL ACTION

8        PRO-VIGIL, INC.,            FILE NO.: 3:22-cv-00114-TCB-RGV

9             Defendant.

10

11

12

13                        DEPOSITION OF

14                        VALERIE GARDNER

15

16

17                       March 13, 2023

18                        9:41 a.m.

19

20

21             75 14th Street, Northeast

22             Atlanta, Georgia 30309

23

24

25             Ashley N. Ellis, CVR-7199, CCR

Valerie Gardner
March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 50

1        Q     So the meeting starts, you and Andrea, McCrossen and

2     D'Amore are on that call; is that right?

3        A     Uh-huh.

4        Q     Who said that they weren't going to go forward and

5     then they rescheduled?

6        A     Dave.

7        Q     And that's was all that was said?

8        A     I mean I'm sure there was more -- there was more said

9     than that, but it was a very short and there wasn't any

10    dialogue.  If you're referring to any of this, the project, no.

11       Q     Okay.  So there wasn't a substantive discussion?

12       A     No, not at all.

13       Q     So it may have been other words that were said, but

14    the gist of it was we're not going to go forward and we'll

15    reschedule?

16       A     Right, that's exactly right.

17       Q     And there was no substance discussed?

18       A     No, sir.

19       Q     Did you know what Dave McCrossen did to investigate?

20       A     No.

21       Q     So the second call that -- let me back up.  So you

22    have this meeting that soon stopped and then is rescheduled.

23    Tell me about that call.  Who was on it?

24       A     Dave and Mike.

25       Q     And you?

Valerie Gardner                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 63

1       Q    Okay.  Did that cause of your supervisors to address

2   that issue with you?

3       A    I actually had a conversation with Dave McCrossen,

4   absolutely, I did.

5       Q    When?

6       A    It was February -- probably February, yeah.

7       Q    Okay.

8       A    And Atlanta experienced record number --

9       Q    This was in February of 2020?

10      A    This was in 2018, uh-huh.  2018.  We had this

11  conversation early 2019 that Atlanta had record number of

12  rainfall, hadn't had this much rain since the 1940s.  And

13  with that said, construction sites basically come to a halt

14  because they're based off the weather.  He and I had this

15  discussion about me, that one month that I was a zero, one

16  month.

17      Q    In 2018?

18      A    One month in the whole time I was there.

19      Q    Okay.  But that was in 2018 you're talking about?

20      A    That's when the rain event was.  It was 2018 into

21  2019.  He and I had that discussion beginning part of 2019.

22      Q    Okay.  So in 2019 is when you had this discussion

23  with him about the zero month?

24      A    Actually it was '20.  It was first of '20, it was

25  2019.  Yes.

Valerie Gardner                              March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

                                                           Page 64

1        Q    What month was it that you had a zero in sales?

2        A    I can't remember the exact month.

3        Q    Would it have been in 2019?

4        A    It could have been.

5        Q    Okay.  And you're saying that's the only month you

6    ever had a zero at Pro-Vigil?

7        A    That I'm aware of, yes.

8        Q    Okay.  So going back to Exhibit 10 and -- well,

9    actually, let me change gears for a second.  Go back to -- pull

10   up Exhibit 4, the rules of engagement.  And look at Page 11,

11   Paragraph 17.  Do you see that performance improvement plan?

12       A    Uh-huh.

13       Q    It says performance improvement plan, a TM or BDC, so

14   TM is territory manager.  What is the BDC?

15       A    I have no idea.

16       Q    Business development consultant, does that sound

17   right?

18       A    Uh-huh.

19       Q    A TM or BDC will be placed on PIP if -- and then the

20   first one is while ramping.  And ramping means that's when you

21   first come on and you're ramping up into your sales channel; is

22   that right?

23       A    That's right.

24       Q    And then the second one is fully ramped.  One month

25   with less than 25 percent quota attainment, two consecutive

Valerie Gardner                                March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

                                                        Page 65

1     months less than 50 percent quota attainment, and then three

2     months and six month period less than 50 percent quota

3     attainment.  Did I read that correctly?

4          A     Uh-huh.

5          Q     Is that a yes?

6          A     Yes.

7          Q     And so there were some standards already built into

8     the rules of engagement concerning when a performance

9     improvement plan would be issued; is that right?

10         A     Uh-huh, yes.

11         Q     And so if you weren't hitting at least a certain

12    percentage of your quota attainment then the PIP would kick in;

13    is that right?

14              MS. COALSON:  Object to form, but you can answer.

15              THE WITNESS:  And so that -- what was the question?

16    BY MR. POPE:

17         Q     I said according to this rules of engagement that if

18    you weren't at least hitting a certain percentage of your quota

19    each month, then a PIP could be issued; is that right?

20         A     Well, I mean there's different -- one month -- are

21    you asking if it's automatic.

22         Q     No, that's not what I asked.  I just said there are

23    standards that are set forth here when a PIP is issued; is that

24    right?

25         A     Right.

Valerie Gardner
Gardner, Valerie Vs. Pro-Vigil, Inc.
March 13, 2023

Page 66

1        Q     And they're based on percentage quota attainment; is
2    that right?
3        A     That is correct.
4        Q     Okay.  Let's go back to Exhibit 10, the personnel
5    action form.  It says Question Number 2, nature of PIP, and
6    then it's got essentially these same factors that we see in the
7    rules of engagement -- while ramping, less than 50 percent, and
8    then ramped to one month with less than 25 percent, ramp two
9    consecutive months, less than 50 percent, and ramp three months
10   in any six-month period less than 50 percent; is that correct?
11       A     Uh-huh.
12       Q     And it's marked ramp one month with less than
13   25 percent quota attainment; is that right?
14       A     Uh-huh.
15       Q     I need you to answer out loud, please.
16       A     Yes.
17       Q     And it says please list attainment rates for the last
18   six months under Question 3.  It says December '19 -- and I'm
19   assuming that means December 2019 -- Valerie Gardner $4972.27
20   out of $6500.  Did I read that correctly?
21       A     Correct.
22       Q     Do you dispute that that's what your sales were for
23   December of 2019?
24       A     No.
25       Q     And then it says January 2020, Valerie Gardner and

Valerie Gardner                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 67

1    then it's got nothing next to the dollar out of $6500 band then

2    zero percent.  Do you dispute that you had a zero sales in

3    January of 2020?

4         A    No, I do not.  And that is the month -- that's the

5    month that Dave and I had the conversation about.

6         Q    Okay.  And then -- well, let me go back to that

7    conversation real quick.  What brought about the conversation

8    with Dave?  I mean, was this a call that he made to you?

9         A    I don't recall what prompted the conversation.  I

10   don't know.

11        Q    What did he tell you during that conversation?

12        A    I don't recall.  I just recall us having that

13   conversation about the rainfall.  I recall that, but I don't

14   recall the remainder of the conversation.

15        Q    Okay.  Did that conversation have anything to do with

16   the fact that you hadn't made any sales that month?

17        A    No, not that I recall.  I don't even recall the

18   conversation -- why the call was even initiated.

19        Q    And going back to Exhibit 10, it says February 2020,

20   Valerie Gardner, $5,194 out of $6500.  Do you dispute that

21   that's what your number was?

22        A    No.

23        Q    And March 2020, it says $5,557 out of $6500.  Do you

24   dispute that's what your sales numbers were for that month?

25        A    No.

Page 68

1      Q    And then April 20, it's got Valerie Gardner $8000 out

2    of 6500, but then it has 0 percent.  Do you see that?

3      A    I do.

4      Q    Do you recall what your sales were in April of 2020?

5      A    I do not.

6      Q    Okay.  Do you believe they were $8000?

7      A    They could have been.

8      Q    Do you know one way or the other?

9      A    I do not.

10      Q    Could they have been zero?

11      A    No.  I mean, no there was one month.

12      Q    And then in May 2020, it says $1,489 out of 6500; is

13    that correct?  I'm just asking did I read that correctly?

14      A    You read it correct, yes.

15      Q    Do you dispute that that's what your number was for

16    the month, your sales number was for the month?

17      A    I'm not sure about that one.

18      Q    Did you provide Mike with any information after you

19    received this PIP disputing the numbers?

20      A    I don't recall.

21      Q    So according to the numbers that are on this, out of

22    the six months that are provided, there may have been only one

23    month where you hit or exceeded the $6500 quota; is that

24    correct?

25      A    That's what it appears, yes.

Valerie Gardner                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 69

1        Q    Okay.  And April 2020, we don't really know whether

2   you exceeded it for that month, do we, because you said you

3   didn't know if that number is correct?

4        A    That is correct.

5        Q    But we do know that you had one zero month in January

6   and one less than 25 percent month in May according to this; is

7   that right?

8        A    According to this.

9        Q    Okay.  Well, do you have any evidence that the $1489

10  is not the correct number?

11       A    The day I was terminated, I was cut off from any of

12  that information.  Pro-Vigil has that information.

13       Q    My question was do you have any --

14       A    No, I do not.

15       Q    Do you remember if you had a zero month in November

16  of 2019?

17       A    No, I do not.

18       Q    Going down to Question Number 4, plan for

19  improvement, it says improve mobile KPI performance attainment

20  and drive a 60-day rolling close rate to exceed project 30 day

21  RMR, meter exceeds your monthly quota.  Keep pipeline updated

22  and accurate.  Did I read that correctly?

23       A    Yes.

24       Q    Did you discuss the plan for improvement during your

25  conversation with Mike?

Valerie Gardner                                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 81

1    raise gender as one of the reasons that you believed that you

2    weren't given that opportunity?

3         A    No.

4         Q    Did you ever report to Dave McCrossen that you

5    believe that you were denied the opportunity with Enterprise

6    because of your gender?

7         A    I presented Dave McCrossen with all of these e-mails,

8    this spreadsheet to let him look at it and make his own

9    determination.

10        Q    Did you ever tell McCrossen that you believed

11   gender --

12        A    No, I did not.

13        Q    Let me finish --

14        A    No, no.

15        Q    Let me finish my question.  Did you ever tell Dave

16   McCrossen that you believed that you were being discriminated

17   against because of your gender?

18        A    No.

19        Q    Did you ever tell Mr. McCrossen that you believed

20   that the PIP was issued in retaliation for any complaints?

21        A    No, I did not.

22        Q    Did you ever contact anybody in human resources and

23   tell them that you thought you were being discriminated against

24   because of your gender?

25        A    There was no human resources department.

Page 82

1    Q    Was there somebody that was in charge of human

2    resources?

3    A    Was there an HR director or -- I could not even tell

4    you.  I don't know.  Was there a whistleblower?  No.

5    Q    Did you contact anybody that had responsibility for

6    human resource and tell them that you thought you were being

7    discriminated against?

8    A    No.

9    Q    Did you contact anybody in human resources and tell

10   them that you thought you were being retaliated against with

11   this performance improvement plan?

12   A    No.

13   Q    In the phone conversation that you videoed, do you

14   recall telling McCrossen that you thought that gender was an

15   issue?

16   A    I don't recall.

17   Q    Were you familiar with Jessica Martinez, that was the

18   human resources person?

19   A    No.

20   Q    Did you ever report anything to her?

21   A    No.

22   Q    So in the conversations that you had with Mike

23   D'Amore where you reference those guys or something to that

24   effect, was there any other conversations with him where you

25   indicated to him that you thought gender was the deciding

Page 83

1    factor in not being able to participate in those deals?

2        A    No.

3        Q    During April, May, and June and the first part of

4    July, did you take any notes concerning the -- not being paid

5    commission on the Enterprise deals?  Like handwritten notes,

6    journals, or anything like that?

7        A    No.

8        Q    Did you take any notes of any phone conversations

9    that you had with Mike D'Amore during that time?

10       A    No.

11       Q    What about the conversations with McCrossen, did you

12   take any notes?

13       A    No.

14       Q    Is the video recording the only recorded --

15       A    Yes.

16       Q    So as I understand it, after your termination, you

17   filed a charge of discrimination with the EEOC; is that right?

18       A    Correct.

19       Q    I'm going to show you what is Exhibit 12.  Are you

20   familiar with that document?

21       (Defendant's Exhibit No. 12 marked for identification.)

22       A    Yes.

23       Q    Did you fill this out?

24       A    Uh-huh, I did.

25       Q    Did you write where it says particulars are, the

Valerie Gardner                              March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 94

1    guys, that was you telling him about discriminatory practice?

2        A    Well, how was I supposed to tell them?  You're

3    discriminating against me.

4        Q    Did you tell him that?

5        A    I don't believe so.

6        Q    So the only time that you raised that issue with

7    D'Amore is when you referred to these other guys?

8        A    I believe so.

9        Q    And you never came out actually said we believe this

10   is because we are women?

11       A    I don't know if we did or not.  I don't know if we

12   did in conversation.  I don't know.

13       Q    But as you sit here today, you don't recall telling

14   him that?

15       A    No.

16       Q    During any of the phone calls that you had with

17   D'Amore, did you recall telling him that you believed that you

18   were being discriminated against?

19       A    I don't recall.

20       Q    And in your e-mails and phone calls with Dave

21   McCrossen, do you recall telling him that you believed that you

22   were being discriminated against because of your gender?

23       A    I don't recall.

24       Q    You're saying you don't recall one way or the other?

25       A    I don't recall specifically telling him that I felt

Valerie Gardner                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 95

 1    like I was being discriminated against.

 2         Q    Okay.  Looking at Paragraph 50 on the next page.  It

 3    says in these conversation, Ms. Gardner and Ms. Hawco make

 4    clear that they believe their male counterparts are being

 5    treated more favorably than they were with respect to the quota

 6    credit split?

 7         A    Uh-huh.

 8         Q    Do you recall ever saying that to D'Amore that you

 9    believed that the males were getting treated better?

10         A    Did I ever say this verbatim, I believe they're

11    getting treated better than myself?

12         Q    Uh-huh.

13         A    I didn't exactly say those words.

14         Q    Did you say something similar to that?

15         A    Why wasn't I given the same opportunity as my

16    counterparts.

17         Q    Okay.

18         A    Okay.

19         Q    But you never came out and said I don't think I'm

20    being treated the same because I'm female?

21         A    I don't recall using those particular words as it's

22    stated in here.  Is that how I felt?  Absolutely.

23         Q    Okay.  But do you recall telling anybody, whether you

24    used the exact words or not, that you believed you were being

25    discriminated against because you're female?

Valerie Gardner                                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 96

1          A     I don't recall.

2          Q     Look at Paragraph 56.  It says on May 22nd, 2020,

3     Ms. Hawco and Ms. Gardner took their concerns to Pro-Vigil's

4     chief revenue officer David McCrossen and asked for his

5     assistance in getting to the bottom of the disparate treatment

6     afforded to them relative to their male peers.  Again, the May

7     22nd, if I recall correctly, was the date of the e-mail that

8     you sent to McCrossen; is that right?  Look at Exhibit 9.

9          A     Okay.

10         Q     So this is May 22nd, the e-mail to McCrossen where

11    I believe you testified earlier this was the first time that

12    you had reached out to him about this issue?

13         A     That is correct.

14         Q     Take a minute and look at this e-mail.  Is there

15    anything in here that references you being treated than your

16    male counterparts?

17         A     No.

18         Q     And there's nothing in here about gender

19    discrimination, is there?

20         A     No.

21         Q     Look at Paragraph 62.  It says throughout this

22    timeframe, everybody involved in these discussions understood

23    that Ms. Gardner and Ms. Hawco believe that they have been

24    treated less favorably than other male territory managers.  Did

25    Mike D'Amore tell you that he thought that you were treated

Page 97

1    less favorably?

2              MS. COALSON:   Object to the form.

3    BY MR. POPE:

4         Q    Did Mike D'Amore tell you that he thought that you

5    were being treated less favorably?

6         A    Did he tell me that?

7         Q    Uh-huh.

8         A    No.

9         Q    Did Mr. McCrossen tell you that he thought that you

10   were being treated less favorably?

11        A    He admitted they made a mistake.

12        Q    Did he say that that was a mistake because of your

13   gender?

14        A    I don't remember verbatim, but he did admit that they

15   made a mistake.

16        Q    You don't recall having a conversation with him about

17   gender discrimination?

18        A    No.

19        Q    Look at Paragraph 69.  It says at the time Pro-Vigil

20   issued the PIP to Ms. Gardner in June 22020, her termination

21   was already contemplated and being discussed.  How do you know

22   that your termination was being contemplated on that date?

23        A    Because of the date I was terminated.

24        Q    Is that the only reason that you believe that that

25   was the case?

Valerie Gardner                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

                                              Page 100

1        Q    Okay.  And we went through your numbers, correct?

2        A    That is correct.

3        Q    You had at least one month where you had zero; is

4    that right?

5        A    Yes.

6        Q    And you had one month that was less than 25 percent;

7    is that right?

8        A    There is a month in there I disagree with.  That's

9    why I did not sign it because I didn't agree with the numbers.

10   And me and Mike D'Amore discussed that.  It wasn't acceptable

11   to me because it was incorrect.  The numbers were incorrect.

12       Q    You had one month though that was less than

13   25 percent; is that right?

14       A    That's what the document states.

15       Q    Okay.  Was that the month that you disputed with him?

16       A    I don't recall the exact month that I disputed.

17       Q    And I recall that you didn't have any issue with any

18   of the numbers when we went through them?

19            MS. COALSON:  Object to the form.

20   BY MR. POPE:

21       Q    As far as you didn't have any evidence that --

22       A    That's what the form states.  I don't know -- I don't

23   have that information.  I cannot log into the system.  I do not

24   have the numbers, Pro-Vigil does.

25       Q    And I recall asking you the question when I went

Valerie Gardner                                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 101

1      through each of the numbers did you have any evidence to

2      dispute those numbers?

3              A     No, I don't.

4              Q     Have you told me all the reasons that you believe

5      that the performance improvement plan was a pretext for your

6      termination?

7              A     Repeat.

8              Q     Have you told me all the reasons that you believe

9      that the performance improvement plan was a pretextual

10     explanation for your termination?

11             A     When all of this started and I started questioning

12     and went all the way to Dave McCrossen, then yes.  This started

13     when I started questioning about the project and I felt like I

14     had every right to question.

15             Q     And I believe you told me earlier that McCrossen had

16     already told you that the commission was going to be paid --

17             A     That is correct.

18             Q     -- before you received this PIP; is that right?

19             A     I don't know the timeline on there.  I would have to

20     find -- I don't know exact date on that.

21             Q     Okay.

22             A     That was the end of May, right?

23             Q     Yes.  After you received this PIP, did you go to

24     McCrossen and say, hey, I complained and now look what they're

25     doing?

Valerie Gardner                                    March 13, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 141

1    expected to hit $6500 per month in RMR?

2         A    It doesn't.

3         Q    Okay.  Where in Exhibit 3 does it say that you are

4    expected to average $6500 per month over any number of months?

5         A    It doesn't.

6         Q    Prior to December of 2019, had you ever had a month

7    where you were less than 25 percent to that $6500 quota in the

8    past?

9         A    Not that I'm aware of.  Not that I can recall.

10        Q    Okay.  Would you look at Exhibit 4, please, the rules

11   of engagement.  And if you would look, please, at the page that

12   at the bottom right it says Plaintiff 11.  Looking at item

13   Number 17, performance improvement plan, does it say that a

14   performance improvement plan will issue if you don't hit

15   100 percent of your quota in any number of months?

16        A    No.

17        Q    When you worked for Pro-Vigil, did you drive a

18   company vehicle?

19        A    Yes.

20        Q    Was there any cost to you for that vehicle?

21        A    No.

22        Q    When you and Ms. Hawco retained attorney David Groff,

23   did you pay any attorney fees to him?

24        A    No.

25        Q    Do you owe him anything to your knowledge?

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF GEORGIA

3                    NEWNAN DIVISION

4   _____

5   VALERIE GARDNER,

6           Plaintiff,

7      v.                              Civil Action

8   PRO-VIGIL, INC.,                   File No.

9           Defendant.                 3:22-cv-114-

10                                      TCB-RGV

11  _____

12              VIDEOTAPED DEPOSITION OF

13        30(b)(6) CORPORATE REPRESENTATIVE FOR

14            PRO-VIGIL, INC. - JENNIFER METZLER

15  DATE:          Wednesday, March 8, 2023

16  TIME:          9:09 a.m. CST/10:09 a.m. EST

17  LOCATION:      Remote Proceeding

18                 84 Northeast Loop 410

19                 San Antonio, TX 78216

20  REPORTED BY:   Desarai De Costa, Notary Public

21  JOB NO.:       5791228

22

23

24

25

30(b)(6) Jennifer Metzler                    March 8, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 50

1      A     Not all three, and not Valerie.  It was
2   really more Ms. Hawco -- Hawco.
3      Q     Okay.  What did he tell you about Ms. Hawco?
4      A     She could be combative on the phone.  Things
5   I really didn't want to know because I wanted to find
6   out for myself, but yeah.
7      Q     Did he tell you that Ms. Hawco had been
8   complaining to him about her pay?
9      A     No, not specifically.
10     Q     Did he tell you that Ms. Gardner had been
11  questioning the pay practices of Pro-Vigil?
12     A     He did not.
13     Q     Did he tell you anything about the PIP for
14  Ms. Gardner other than what was written in that
15  document we looked at?
16     A     He did not.
17     Q     Did he tell you what his go-forward plan was
18  when he put that PIP in place?
19     A     Not specifically, no.
20     Q     Okay.  Did he tell you generally?
21     A     Yeah.
22     Q     What did he tell you?
23     A     Well, the plan -- if she doesn't make quota
24  this month, the recommendation would be to move on
25  with termination.

Page 66

1        A     I don't know.

2        Q     At the time of this communication, which

3   again was June 24th, the decision to terminate

4   Ms. Gardner had not yet been made; is that right?

5        A     So I didn't know the date of when I was made

6   aware specifically.  So this helps -- June 24th.  And

7   so I -- I was made aware at a high level before that,

8   but seeing this -- being able to look at the numbers

9   myself is when I began my research.  And so the

10  decision had not been formalized, no.

11       Q     Okay.  Do you know if -- strike that.  I

12  think you said earlier that you were never made aware

13  that Ms. Gardner had been complaining about

14  Pro Vigil's pay practices?

15       A     No.

16       Q     Okay.  Were you ever made aware of that

17  after the fact?

18       A     After the fact.

19       Q     After her termination?

20       A     Well after the fact.  Like -- like --

21       Q     Prior to her filing -- I'm sorry.  Go ahead.

22       A     Last week.

23       Q     Last week?

24       A     Yeah.  This -- I was not aware of any of

25  that until I read the documents.

30(b)(6) Jennifer Metzler                    March 8, 2023
Gardner, Valerie  Vs. Pro-Vigil, Inc.

Page 67

1      Q     Okay.  Were you ever made aware -- well I

2   think you just answered this but just to be clear --

3   were you ever made aware of a letter from

4   Ms. Gardner's legal counsel to Pro-Vigil after her

5   termination?

6      A     Yes.

7      Q     Tell me what you remember about that.

8      A     I learned about it yesterday.

9      Q     Okay.  And actually, I think I asked the

10  question wrong.  I think I said "after termination"

11  but it was dated the day before her termination.  Are

12  we talking about the same letter?

13     A     Sent to Lee Orr?

14     Q     Yes.

15     A     I did not know about it until yesterday.

16     Q     Okay.  We are in the home stretch here.

17  Okay.  I'm pulling up Exhibit 2 again that we looked

18  at earlier.  And this is the Personnel Action Form for

19  Ms. Gardner's termination; correct?

20     A     Yes.

21     Q     And here in the middle of page 1 of

22  Exhibit 2, it says "Termination Reason, Performance";

23  right?

24     A     Yes.

25     Q     And whereas "Termination Type" down below,