IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| VALERIE GARDNER,<br><br>　　Plaintiff,<br><br>v.<br><br>PRO-VIGIL, INC.,<br><br>　　Defendants. | CIVIL ACTION FILE<br><br>No. 3:22-CV-00114-TCB |

**PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION [DOC. 36]**

In her Complaint [Doc. 1], Plaintiff Valerie Gardner brought claims against her former employer, Defendant Pro-Vigil, Inc., for sex-based discrimination and retaliation in violation of Title VII. Magistrate Judge Russell G. Vineyard's Report and Recommendation [Doc. 36] (the "R&R") recommends that Pro-Vigil's motion for summary judgment [Doc. 25] be granted as to both claims. As shown below, at least with respect to Ms. Gardner's retaliation claim,[1] there are genuine questions of material facts that preclude summary judgment. Plaintiff respectfully objects to

---

[1] Although Plaintiff believes she produced sufficient evidence to support a jury verdict in her favor on her discrimination claim (Count I), for reasons unrelated to the merits of that claim, she is not objecting to the R&R's recommendation as to Count I. These objections focus only on Count II, her retaliation claim.

the R&R and asks this Court to deny summary judgment as to Count II of the Complaint and set this case for trial.

**I.    The Record Evidence Creates a Genuine Issue of Material Fact About What Truly Motivated Ms. Gardner's Termination, and a Jury Could Find It Was Retaliation, not Legitimate Performance Concerns.**

Summary judgment looks to whether there is sufficient evidence in the record to support a finding in the plaintiff's favor. It is not incumbent upon the plaintiff to prove that judgment in her favor is mandated or to conclusively disprove every other potential finding a jury could make. Particularly with respect to the performance improvement plan ("PIP") that was issued to Ms. Gardner on June 9, 2020, the R&R—perhaps inadvertently—seeks to substitute the author's own view of the evidence for those findings that could (and should only) be made by a jury. The details around the significance of this evidence is detailed in Section I(B), *infra*, but first, it is necessary to provide context by briefly reviewing the timeline leading up to the PIP.

**A.    Ms. Gardner's Complaints of Discrimination Set the Stage for Her Retaliatory Termination**

Ms. Gardner sold Pro-Vigil security solutions for nine years: from 2011 until 2016, she did so as an employee of E-Guard Monitoring and Security, which was Pro-Vigil's distributor in the southeast, and then after Pro-Vigil's acquisition of E-Guard in April 2016, she became an employee of Pro-Vigil until her termination in

July 1, 2020. R&R at p.7 & n.9. Between April 2016 and May 2020, Ms. Gardner was never made aware of, let alone disciplined for, any performance issues, nor was she ever placed on a PIP. R&R at p.17 n.21. However, all of that would change over the next three months, when she would be placed on her first PIP, not even given the chance to complete it, and suddenly terminated, supposedly for performance, all at a time where she was a squeaky wheel about what she reasonably perceived to be discriminatory treatment. *See generally* R&R at pp.9–16.

On April 2, as a result of changes in customer demand that were driven by COVID, Pro-Vigil had announced a policy change whereby mobile sales representatives (such as Ms. Gardner and Ms. Hawco) would receive credit for mobile-solution sales made by fixed sales representatives. R&R at p.8. The e-mail announcing this new policy did not state that the mobile rep had to have any involvement in the sale to share in the quota credit. *Id.* In fact, it expressly contemplated that involvement of the mobile rep was *not* a prerequisite: "**_Any Fixed TMs_** selling mobile solutions to fixed customers **_will warrant_** a 50/50 quota credit split with the corresponding mobile TM. **_In some cases_**, the mobile TM may not need to get involved, but if so, the split will warrant the pre or post-sales support required." *Id.* (emphasis added). This message was clear: mobile reps would share in these sales by fixed reps regardless of personal involvement in the

transaction, but if the mobile rep did need to assist with one of these sales, they weren't excused because it was outside of their usual channel, and it would not hurt their bottom line, because the quota split would "warrant the pre or post-sales support required."

Yet in the weeks that followed this announcement, that was not how Pro-Vigil implemented this policy. Ms. Gardner discovered fixed sales reps making mobile sales in her territory, and she had not shared in the quota credit or been notified. R&R at p.9. She and Ms. Hawco then pulled numbers from Salesforce, Pro-Vigil's customer relationship management platform, and made an even more startling discovery: in the month of April 2020, there had been twenty-five sales of mobile solutions by fixed reps. All of the fixed sales representatives were males, including a man named James Rossi. For the twenty transactions in which the corresponding mobile rep was also male, the fixed and mobile reps shared quota credit exactly as Pro-Vigil had announced in its April 2 e-mail. This included a sale by Mr. Rossi of mobile solutions to Enterprise in Baltimore. Yet for the five transactions by Mr. Rossi in which Ms. Gardner, a woman, was the corresponding

mobile representative, no quota credit was allocated to her. *See* [Doc. 25-4] at p.178 (Ex. 7 to Plaintiff's Deposition).[2]

The significance of this was not lost on Ms. Gardner at the moment she discovered it:

> I mean, everyone that split the commissions, it was a male, male, male, male, except for Atlanta. The only – the only territory within all these accounts, within this account, the only territory was Atlanta which had a female salesperson

[Doc. 33-2] at ¶ 20; [Doc. 25-4] at 92:18-23. Over the next three months—April, May, and June 2020, immediately preceding her termination on July 1—Ms. Gardner and Ms. Hawco engaged in a series of communications with their chain of command at Pro-Vigil about whey they, and eventually Ms. Gardner alone,[3] had been excluded from these quota splits. These conversations began innocently enough—for example, with an April 13, 2020 e-mail stating "We were just curious here . . . can someone explain the process again," and a May 14 call asking why they had not been given the same opportunity that "the other *guys* were"— but

---

[2] A more legible, color copy of Ex. 7 to Plaintiff's deposition, bearing Bates number Plf0014, is attached to these objections as **Exhibit A** to assist in the Court's review.

[3] At the time Ms. Gardner and Ms. Hawco discovered these sales, they knew only that the five sales for which no quota credit was shared were in Georgia, which was divided between the two of them (i.e., there were no other mobile reps, male or female, in the State of Georgia). Only later was it clarified that all the sales were in fact in Ms. Gardner's territory.

escalated over time, becoming increasingly adversarial and at times hostile. On May 20, they complained that they had yet to receive any explanation, reiterating that "the other *guys*" had been given financial benefits unavailable to these two women. When Mr. D'Amore tried to shut the conversation down, Ms. Gardner and Ms. Hawco pushed back, questioning why Atlanta (where both the mobile reps were female) seemed to be the only place where this policy had not been implemented as announced. And in a subsequent e-mail, they pushed Mr. D'Amore further, demanding "reasonable responses" that aligned with "company Policy," referring to Pro-Vigil's "Rules of Engagement" (sometimes referred to as "ROE"). Again, Mr. D'Amore sought to shut the conversation down, prefacing his reply with the statement: "This thread will end after this email." R&R at pp.10–13; *see also* [Doc. 25-4] at pp.179–181 (Ex. 8 to Plaintiff's Deposition).

Dissatisfied with Mr. D'Amore's curt responses and seeming unwillingness to address square on their concerns, Ms. Gardner and Ms. Hawco took their concerns further up the chain of command. On May 22, 2020, they e-mailed Pro-Vigil's Chief Revenue Officer, Dave McCrossen, to "formally request [his] research and responses" to the unresolved issues they had raised with Mr. D'Amore. Mr. McCrossen consulted with Myles Osswald, Pro-Vigil's Chief Financial Officer, and the two men eventually (in late May or early Jun 2020) determined that "they had

clearly made a mistake" that Ms. Gardner should be given quota credit for the Georgia sales by Mr. Rossi. R&R at pp.13–16. In other words, while Pro-Vigil denies it intentionally excluded Ms. Gardner from this quota-sharing policy, it cannot deny that there was merit to what she complained about, as evidenced by its eventual acquiescence. Ms. Gardner testified unequivocally that throughout these discussions, their use of the gendered term "guys" was intentional, and not a colloquialism to refer to a group of individuals regardless of gender. [Doc. 25-4] at 140:14–20; [Doc. 33-2] at ¶ 25.

Finally, on June 30, 2020—the day before Plaintiff was fired—her former counsel, David Groff, e-mailed a letter to Pro-Vigil's CEO formally asserting a claim on Ms. Gardner's behalf under Title VII. [Doc. 25-4] at p.185 (Ex. 11 to Plaintiff's Deposition). The R&R is dismissive of this letter, noting that "Gardner . . . is unaware as to whether Orr received and reviewed the letter on June 30, or if he shared it with anyone else at Pro-Vigil . . . ." R&R at p.20 n.25. It is undisputed that Mr. Orr did *eventually* give the letter to Mr. Osswald, belying any inference that the e-mail was never received at all. At summary judgment, when the facts and inferences are to be viewed in the light most favorable to Plaintiff, the absence of any suggestion (let alone evidentiary proof) that Mr. Orr did not receive the e-mail on the day it was sent speaks volumes.

### B. Pro-Vigil Retaliates Against Ms. Gardner

Despite Pro-Vigil's reluctant agreement to Ms. Gardner's request that she receive credit for the disputed transactions, there is abundant evidence from which a jury would be justified to find that it subsequently retaliated against Ms. Gardner. On June 9, 2020, Ms. Gardner was placed on a PIP, the first performance counseling she had ever been issued. There are numerous reasons why a jury could conclude that the June 9, 2020 PIP was not a legitimate attempt at performance management, but instead, was a manufactured pretext designed to lay a foundation for Ms. Gardner's termination.[4]

Pro-Vigil's Rules of Engagement provide that for a fully ramped (i.e., onboarded) employee, a PIP may issue in one of three circumstances: (1) if they have one month with less than 25% quota attainment; (2) if they have 2 *consecutive* months with less than 50% quota attainment; or (3) if they have 3 months in any 6 month window with less than 50% quota attainment. [Doc. 25-4] at p.168 (Ex. 4 to Plaintiff's Deposition at Plf0011, item 17).[5] After Mr. McCrossen acknowledged

---

[4] Plaintiff is not arguing that the PIP, standing alone, was an adverse employment action. Rather, the PIP is the *lone* documentation of *any* performance problems throughout Ms. Gardner's four-plus years with Pro-Vigil. If a jury were to question the motives behind this PIP, the same jury would be more than justified to question the motives behind the termination that followed shortly on its heels.

[5] Pro-Vigil's mobile territory managers had a recurring monthly revenue "goal" of $6,500, and they received commission payments in any month in which they achieved at least 50% of

- 8 -

Pro-Vigil's "mistake" and directed that Ms. Gardner be given credit for those sales transactions, she was 182% to quota in May 2020. *See* [Doc. 33-3] at p.22, top right corner ("Achievement 182%"). Yet when Pro-Vigil went looking for a pretextual performance issue to justify disciplining Ms. Gardner and to lay a foundation for her eventual termination, it chose to analyze her April and May 2020 sales *without regard* to the quota credit she had been told she would share in. Thus, her May sales were reported as $1,489.00, or 23% to quota goal. [Doc. 25-4] at p.183 (Ex. 10 to Plaintiff's Deposition). In other words, although Pro-Vigil might have begrudgingly paid Ms. Gardner for the disputed transactions, it did not let her share in that quota credit in one area that really mattered at the onset of the pandemic, which was for purposes of determining whether she actually met her sales quota.

The fact that the PIP selectively curated Ms. Gardner's sales numbers is further evidenced by the selected reason for the PIP. The PIP itself states that it was being issued because Ms. Gardner had one month with less than 25% quota attainment. [Doc. 25-4] at p.183. Yet, if the numbers stated in the PIP were genuine, she would have achieved 0% in April 2020 and 23% in May 2020. Why then would

---

that goal. [Doc. 33-3] at p.22, top right corner; R&R at p.6; [Doc. 25-4] at p.161 (Ex. 3 to Plaintiff's Deposition).

the PIP not be issued for 2 consecutive months with less than 50% quota attainment? Or why would the PIP not have issued in May 2020 for one month (April) with less than 25% attainment? For that matter, why did Pro-Vigil not place Ms. Gardner on a PIP in February 2020, following her January sales of $0? In response to any of these questions, a jury would be authorized to conclude that it was because Pro-Vigil was not genuinely and in good faith concerned with Plaintiff's job performance. In February, she had not made any complaints of discrimination, and in May, they had only just begun. It was not until late May and June that those complaints escalated and became adversarial, and it was only at that point that Pro-Vigil suddenly became so concerned with Ms. Gardner's numbers that it placed her on a PIP. If a jury believed that were the case, that alone is evidence of retaliatory intent.[6]

Nothing illustrates the pretextual nature of the PIP more than the fact that Ms. Gardner was not even given an opportunity to complete it before being fired. The PIP was issued on June 9, 2020. The corrective action called for related to improving her performance month over month. Yet she was fired on July 1, less

---

[6] Even if Plaintiff's earlier sales numbers would have justified discipline, at summary judgment, the fact that Pro-Vigil waited until *after* she complained about discrimination to issue such discipline, when it could have done so earlier, is a fact that must be viewed in the light most favorable to Plaintiff. This, too, could support a finding of retaliatory animus.

than one full month after being placed on the PIP.[7] When asked about the timing of the PIP, even Pro-Vigil's own corporate representative testified that "[i]f this was happening now, then I'd have a different conversation for sure," because now she is "much more process oriented in the way [she] approach[es] performance plans, and [she] view[s] a performance plan as an opportunity to help somebody improve." [Doc. 25-5] at 55:8 – 56:7. A juror hearing such testimony could interpret it as a concession that when Ms. Gardner's PIP was issued, it was *not* a genuine opportunity to improve, but a pretextual fabrication to justify the termination of an employee who had never previously been disciplined.[8]

---

[7] Plaintiff testified that she believed she achieved her monthly sales quota in June 2020, but even if Pro-Vigil's numbers are correct, she exceeded the 50% threshold in June making her eligible for commission payments, which would not justify discipline under Pro-Vigil's Rules of Engagement.

[8] The R&R erroneously states that Plaintiff's allegations about the timing of the PIP "would render . . . superfluous" the provisions of the Rules of Engagement that allow an employee to be placed on a PIP for any of three reasons. R&R at p.53. This is not the case. An employee who achieves less than 25% of quota in one month could be placed on a PIP, even if they achieved 50% or higher in other months. Another employee who never dipped below, say, 45% of quota could nevertheless be placed on a PIP if he achieves less than 50% in two consecutive months, or less than 50% in three months in any six-month period. If Pro-Vigil *could* have placed Ms. Gardner on a PIP in February 2020 for one month at less than 25%, the fact that it didn't, and instead chose to wait until *after* her complaints, could be evidence of retaliation, and that in no way renders the other provisions of the PIP "superfluous." Pro-Vigil was not "waiting" to see if Ms. Gardner became eligible for discipline under any other aspect of the ROE; it did not eventually place her on a PIP for two consecutive months of less than 50%, or three months in a six-month window of less than 50%. If an employee is subject to termination for conduct a company is aware of, but it is only after the employee complains of discrimination months later that the company actually elects to terminate the employee, a reasonable juror could find that it was the complaint, and not the underlying conduct, that *actually* motivated the termination.

Ms. Hawco was put on a PIP at the same time as Ms. Gardner, and on July 1, 2020, both women were fired "within minutes of each other" according to Pro-Vigil's corporate representative. [Doc. 25-5] at 54:13-15. Meanwhile, the evidence shows that male employees who had not complained about discriminatory treatment were given much more leeway. Daniel Jarosz, for example, was also fired on July 1, but the PIP that preceded his termination was *at least* his second PIP in the preceding twelve months, and Pro-Vigil's corporate representative admitted that Mr. Jarosz's performance in 2019-2020 was significantly worse than Ms. Gardner's. [Doc. 33-2] at ¶¶ 38–40. In other words, he had been warned about his performance, given the chance to improve, objectively failed to improve, and only then was terminated. Ms. Gardner and Ms. Hawco were, effectively, only "warned" about their performance by the time it was too late, as they weren't even permitted to complete their first PIPs, and Ms. Gardner was fired following a month in which her numbers *did* improve over the preceding two months.

## II. The R&R Places Undue Emphasis on the *McDonnell Douglas* Test and Gives Short Shrift to Plaintiff's Convincing Mosaic Arguments

In its thirty-ninth and final footnote, the R&R concludes that "[t]o the extent" Ms. Gardner had raised a "convincing mosaic" argument, "for all the reasons discussed herein, the record simply does not support such an inference." R&R at pp.63–64 n.39. By contrast, the R&R devotes more than two full pages to a

recitation of the *McDonnell Douglas* burden-shifting framework (*id.* at pp.29–32) and then proceeds to employ that analysis methodically throughout the analysis. Plaintiff's response to Pro-Vigil's motion for summary judgment argued clearly that even under the *McDonnell Douglas* framework, the case should proceed to trial, but that the most appropriate way to analyze these facts is the convincing mosaic:

> Even under the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), this case should proceed to trial. However, the *McDonnell Douglas* framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *accord Reymore v. Marian Univ.*, No. 1:16-cv-102-SEB-DMI, 2017 WL 4340352, at *8 (S.D. Ind. Sept. 29, 2017) ("[A] district court need not limit itself to analyzing the evidence only according to the *McDonnel Douglas* template, nor should it be bound by the formulaic foxtrot which has developed under that framework."). "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328.
>
> "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal footnote and punctuation omitted). Such a mosaic may exist when, for example, the evidence consists of
>
>> (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically

> better treatment of similarly situated employees, and (3) that the employer's justification is pretextual.
>
> *Lewis v. City of Union City*, 934 F.3d 1169, 1185. However, the convincing mosaic is not a standalone legal requirement or test with specific elements that must be satisfied. *Williams v. Housing Opportunities for Persons with Exceptionalities*, 777 F. App'x 451, 454 n.4 (11th Cir. 2019) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016)). The governing standard, of course, "is simply whether the evidence would permit a reasonable factfinder to conclude that plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. In making this determination, the "[e]vidence must be considered as a whole," not in piecemeal fashion. *Id.* A Court must refrain from weighing conflicting evidence or making credibility determinations, and all evidence and inferences to be drawn therefrom must be viewed in the light most favorable to Plaintiff. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011).

[Doc. 33] at pp.2–4.

The Eleventh Circuit has recently condemned the "all-too-common" misconception that the *McDonnell Douglas* test "is a stand-in for the ultimate question of liability in Title VII discrimination cases," stating unequivocally: "It is not." *Tynes v. Fla. Dep't of Juvenile Justice*, 88 F.4th 939, 941 (11th Cir. 2023). Noting that it can be difficult to ascertain an employer's true motives when only circumstantial evidence is available, the *Tynes* panel explained that the *McDonnell Douglas* analysis was "designed to draw out the necessary evidence" in these cases. *Id.* at 944. The framework "is *not* . . . an independent standard of liability under

Title VII," but merely "an evidentiary tool that functions as a *procedural* device, designed only to establish an order of proof and production." *Id.* at 944–45 (internal punctuation omitted). *Tynes* made clear—not for the first time in the Eleventh Circuit's jurisprudence, but for the most recent time—that no matter what mode of analysis is employed, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* at 946 (*quoting Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

*McDonnell Douglas* is one means of analyzing evidence, but it is not the only one; the convincing mosaic is another. The latter approach employs the novel philosophy of "treat[ing] an employment discrimination suit in [the] same way we would treat any other case—jumping directly to the ultimate question of liability and deciding whether the moving party is entitled to judgment at that stage of the case." *Id.* at 947. "A plaintiff proving her case through the convincing mosaic standard may point to ***any relevant and admissible evidence***." *Id.* at 946 n.2 (emphasis added). Among the district courts within the Eleventh Circuit, however, the big-picture questions pertaining to liability—i.e., is there sufficient evidence here, viewed as a whole and in context, to support a finding in the

plaintiff's favor—has been subsumed by an overly strict reliance on *McDonnell Douglas* as a "test" for Title VII liability.

To be clear, Plaintiff's position is not that the R&R erred by employing a *McDonnell Douglas* analysis at all; even under such a framework, Plaintiff's retaliation claim should proceed to trial. But the R&R embodies the overly technical, "check the box" analysis of employment discrimination and retaliation claims eschewed by the Eleventh Circuit in *Tynes*, eventually rejecting any convincing mosaic argument in a conclusory fashion in a footnote. Making matters worse, that footnote suggests that it was unclear whether Plaintiff even attempted to invoke the convincing mosaic analysis, when she clearly did, as shown above.

Prior to June 2020, Ms. Gardner had never been disciplined or counseled about her job performance. In April 2020, Pro-Vigil announced that "any" sale by a fixed rep would result in quota credit being shared with the corresponding mobile rep, but that same month, that policy was implemented *only* for transactions in which *both* sales reps were male. When Ms. Gardner complained about this, the company admitted it made a "mistake" and ultimately paid her for the disputed transactions. But the following month, it issued a PIP based on sales figures that did *not* include those disputed transactions. According to the numbers in the PIP, Pro-Vigil could have placed Ms. Gardner on a PIP in February, but not

only did it not do that, it didn't have any sort of documented counseling, even a verbal or written warning. Instead it waited until June, after Ms. Gardner's complaints, to impose the PIP. Then it fired her less than a month later, before she had any opportunity to complete the PIP or improve her numbers, and one day after (in addition to her prior complaints) her lawyer e-mailed a formal complaint of discrimination to Pro-Vigil. Her female colleague who complained with her about discrimination was also placed on a PIP in June, then fired "within minutes" of Plaintiff's termination.

Against this backdrop, Plaintiff's retaliation claim should survive summary judgment. Perhaps a jury would agree with the R&R that there is no causal connection between her protected activity and her termination, but without question, there is evidence from which a jury *could* conclude otherwise. That is the test at summary judgment, and that is the only test at summary judgment. As detailed at length in Plaintiff's summary judgment opposition brief [Doc. 33] and supporting documentation, Plaintiff's termination simply does not pass the smell test when all of the evidence is viewed as a whole and in the appropriate context.

### III. Conclusion

Plaintiff's retaliation claim is ripe with disputed facts, and summary judgment should be denied. For all these reasons, Plaintiff respectfully asks that

this Court sustain these objections, overrule the R&R's recommendation that summary judgment be granted as to Count II of the Complaint, deny Pro-Vigil's motion as to Count II, and set this case for trial.

Respectfully submitted this 1st day of February, 2024.

*/s Jennifer K. Coalson*
Jennifer K. Coalson
Georgia Bar No. 266989
Andrew Y. Coffman
Georgia Bar No. 173115
Parks, Chesin & Walbert, PC
1355 Peachtree St., 20th Floor
Atlanta, GA 30309
(404) 873 - 8000
jcoalson@pcwlawfirm.com
accofman@pcwlawfirm.com
*Counsel for Plaintiff*
